STEPHEN P. SONNENBERG
GENEVIEVE C. NADEAU
PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, New York 10022
(212) 318-6000

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OSWALD WILSON, <br><br> Plaintiff, <br><br> - against - <br><br> AMERICAN BROADCASTING CO., INC., ABC CO, INC., DISNEY ENTERPRISES, INC., THE WALT DISNEY COMPANY, MICHAEL ZDYRKO, CHARLES ZANLUNGHI, WILLIAM TRACY, BRENDAN BURKE, ROBERT SCHLES AND SANDY RAMJATTAN <br><br> Defendants. | **1:08-cv-01333-LAP** |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PORTIONS OF PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

ARGUMENT......................................................................................................2

I.      Plaintiff Still Fails To State An FMLA Claim Against Defendant Tracy ..............2

II.     Plaintiff's Additional Allegations Against Defendants Burke, Ramjattan, And Tracy Do Not Help Him To State A Claim Under Any Theory.....................5

III.    Plaintiff's Negligence Claim Is Preempted By New York's Workers' Compensation Law ................................................................................9

IV.     Plaintiff Should Not Be Granted Leave To Further Amend His Complaint ........10

CONCLUSION ...............................................................................................10

# TABLE OF AUTHORITIES

Page

## Cases

*Brunelle v. Cyro Indus.*,
   225 F. Supp. 67 (D. Me. 2002).................................................................................2

*Carmody v. City of New York*,
   No. 05-cv-8084 (HB), 2006 U.S. Dist. Lexis 25308
   (S.D.N.Y May 11, 2006) .......................................................................................9

*Garrido v. Coughlin*,
   716 F. Supp. 98 (S.D.N.Y. 1989) ..........................................................................7

*Johnson v. A.P. Prods., Ltd.*,
   934 F. Supp. 625 (S.D.N.Y. 1996) .........................................................................2

*Keene v. Rinaldi*,
   127 F. Supp. 2d 770 (M.D.N.C. 2000) ...................................................................2

*Le Williamson v. Deluxe Fin. Servs.*,
   No. 03-2538-KHV, 2005 U.S. Dist. LEXIS
   15293 (D. Kan. Jul. 6, 2005) .................................................................................2

*Malaney v. El Al Isr. Airlines*,
   No. 07 Civ. 8773 (DLC), 2008 U.S. Dist. LEXIS 1709
   (S.D.N.Y. Jan. 4, 2008) ........................................................................................7

*Redhead v. Conference of Seventh-day Adventists*,
   440 F. Supp. 2d 211 (E.D.N.Y. 2006)...................................................................3

*Riester v. Lichtman*,
   884 F. Supp. 751 (W.D.N.Y. 1995).......................................................................9

*Ruhling v. Tribune Co.*,
   cv-04-2430 (ARL), 2007 U.S. Dist. Lexis 116 (E.D.N.Y. Jan. 3, 2007) .......................9

*Whidbee v. Garzarelli Food Specialties, Inc.*,
   223 F.3d 62 (2d Cir. 2000) ....................................................................................6

## Regulations

29 C.F.R. § 825.104(d)..............................................................................................3

29 C.F.R. § 825.800..................................................................................................3

Defendants American Broadcasting Companies, Inc., Michael Zdyrko, Charles Zanlunghi, William Tracy, Brendan Burke, Robert Schles, and Sandy Ramjattan (collectively, "Defendants") respectfully submit this reply memorandum of law in support of their motion for an order dismissing portions of the Complaint in this action for failure to state a claim upon which relief can be granted.

## INTRODUCTION

In response to Defendants' motion to dismiss portions of his Complaint, Plaintiff submitted an Amended Complaint (attached as Exhibit 1 to his opposition papers) in which he dismisses his cause of action pursuant to Section 1985, dismisses his cause of action pursuant to the FMLA with respect to all but one individual defendant, and makes clear that he is not asserting claims against any individual defendant pursuant to Title VII. Plaintiff's Amended Complaint, however, still suffers from the following deficiencies:

- Plaintiff does not and cannot allege facts sufficient to state a claim against Defendant Tracy under the FMLA;

- Plaintiff does not and cannot allege facts sufficient to state a claim against Defendants Tracy, Burke or Ramjattan under any theory; and

- Plaintiff's cause of action for negligent infliction of emotional distress is barred as a matter of law.

Moreover, Plaintiff's unsuccessful attempt to cure these deficiencies makes clear that he cannot in good faith plead facts sufficient to allow these claims to survive. Accordingly, the Court should dismiss these clams, without leave to amend.

# ARGUMENT

## I.    Plaintiff Still Fails To State An FMLA Claim Against Defendant Tracy

Plaintiff has agreed to dismiss his FMLA claim against five of the six individual defendants, but still purports to assert a claim against Defendant Tracy. The allegations in Plaintiff's Amended Complaint are precisely the same as in the original Complaint, however, and continue to be insufficient to establish that Defendant Tracy qualifies as an "employer" under the FMLA, or that he took any action which violated the statute.

The court in *Johnson v. A.P. Prods., Ltd.*, 934 F. Supp. 625 (S.D.N.Y. 1996), cautioned that the FMLA's definition of "employer" should not be interpreted so broadly as to "support liability against any agent or employee with supervisory power over employees." *Johnson,* 934 F. Supp. at 628-29. Other courts have agreed that the intent behind the statute was to impose individual liability only upon an employer's owners, officers, and the like.[1] Indeed, the federal regulations implementing the FMLA explain that the term "employer" includes "individuals such as corporate officers acting in the interest of the employer." 29 C.F.R. § 825.104(d). Nevertheless, in support of his claim against Defendant Tracy, Plaintiff alleges only as follows:

> In February 2007, Plaintiff met with Defendants Ramjattan
> and Defendant Tracy [sic]. . . He asked for a work schedule
> which would allow him to keep medical appointments
> every Tuesday afternoon. Tracy promised this
> accommodation. . . While initially, after providing the note

---

[1] *See Le Williamson v. Deluxe Fin. Servs.*, No. 03-2538-KHV, 2005 U.S. Dist. LEXIS 15293, *28 (D. Kan. Jul. 6, 2005) (granting summary judgment for individual defendants when human resources manager and supervisory employees lacked sufficient responsibility to affect plaintiff's FMLA rights); *Brunelle v. Cyro Indus.*, 225 F. Supp. 2d 67, 82 (D. Me. 2002) (granting summary judgment for individual defendant even though he had limited responsibility for making decisions relating to company's denial of plaintiff's leave); *Keene v. Rinaldi*, 127 F. Supp. 2d 770, 777-78 n.3 (M.D.N.C. 2000) ("[N]either the FLSA nor the FMLA were intended to impose liability on mere supervisory employees as opposed to owners, officers, etc.").

> from his therapist, Plaintiff was given a work schedule
> which accommodated this request, as he had been
> promised, after a few weeks he was given a schedule which
> required him to work on alternate Tuesday afternoon.

(Amend. Complt. ¶¶ 34-36.) From this, Plaintiff concludes that "Defendant Tracy was no

mere supervisory employee but a director who can control in whole or in part, Plaintiff's

ability to take a leave of absence and return to Plaintiff's position." (Opp., p.5.)

Plaintiff's conclusory allegations do not come close to establishing that Defendant Tracy

was an employer as defined by *Johnson* and 29 C.F.R. § 825.104(d). The conclusion

overreaches in several ways.

First, Defendant Tracy is not a "director" of ABC as Plaintiff imprecisely

suggests. Plaintiff alleges that Defendant Tracy held the titles "Director of ENG Day to

Day Operations" and "Vice President of ENG Day to Day Operation," without providing

any explanation other than to allege that he supervised three other individual defendants.

Plaintiff thus provides no basis for concluding that Defendant Tracy is or ever has been

the equivalent of an owner or officer of ABC – because he is not.

Second, Plaintiff still does not allege that Defendant Tracy controlled his ability

to take (and denied him) FMLA leave. Instead, the Amended Complaint merely alleges

Defendant Tracy promised him the "accommodation" of a certain schedule to keep

medical appointments. (Amend. Complt. ¶ 34.) In other words, Plaintiff does not

actually allege that he requested any form of leave at all, but rather a scheduling

accommodation.[2] *See* 29 C.F.R. § 825.800 (defining FMLA leave to include continuous

---

[2] Plaintiff also fails to allege that he was even eligible to take leave under the FMLA. *See Redhead v. Conference of Seventh-day Adventists*, 440 F. Supp. 2d 211, 224 (E.D.N.Y. 2006) (dismissing FMLA claim when plaintiff failed to allege defendant qualified under FMLA's definition of "employer" or that she worked at least 1,250 hours for defendant during previous twelve-month period).

leave, intermittent leave of periods of an hour or more, and a leave schedule that reduces the usual number of hours worked per week). Therefore, at most, Plaintiff has alleged that Defendant Tracy had some ability to affect his schedule.[3] Moreover, Plaintiff's allegation that he was required to present a note from his therapist *to the ABC Medical office* in order to justify the scheduling accommodation, makes clear that Defendant Tracy did not actually have the authority to approve a request for medical leave. (Amend. Complt. ¶ 35.)

Finally, Plaintiff does not allege that Defendant Tracy violated the FMLA. Plaintiff alleges only that Defendant Tracy "promised" him the "accommodation" of Tuesday afternoons off, which Plaintiff received, and that some time later he "was given a schedule which required him to work on alternate Tuesday afternoon." (Amend. Complt. ¶ 34, 36.) He alleges, therefore, that Defendant Tracy agreed to give him what he asked for (not a violation of any statute), and that some time later an unnamed person or persons gave him a different schedule. Even if Plaintiff means to imply that Defendant Tracy is the unnamed person who changed his schedule, Plaintiff's allegations are insufficient to infer a violation of the FMLA because there is no basis for concluding that Plaintiff's modified schedule qualified as FMLA leave in the first place, or that the schedule change constituted a denial of FMLA leave or in any other way was a violation of the statute.

Accordingly, Plaintiff's FMLA claim against Defendant Tracy is much ado about nothing. It should be dismissed with respect to Defendant Tracy as well.

---

[3] Defendants note that Plaintiff has not alleged a cause of action under the Americans with Disabilities Act, which does not provide for individual liability. Moreover, even if his FMLA claim would be more properly framed as an ADA claim, Plaintiff cannot now bring such a claim given that he has not timely exhausted his administrative remedies.

## II.    Plaintiff's Additional Allegations Against Defendants Burke, Ramjattan, And Tracy Do Not Help Him To State A Claim Under Any Theory

Plaintiff does not allege that Defendants Burke, Ramjattan and Tracy actively participated in any discrimination against him.[4]  Instead, Plaintiff claims only that their knowledge of alleged discrimination (almost entirely after the fact) and responses to his alleged complaints of discrimination constitute a violation of applicable laws.  Plaintiff's bare allegations against these defendants are as follows (the allegations new to his Amended Complaint are underlined).

- Plaintiff alleges that he "mentioned" to Defendants Tracy and Ramjattan in February 2007 that "he did not have a work bench or test equipment rack," and that they "took no steps to remedy any of [his] complaints of discrimination and reprisals after being informed of them."  (Amend. Complt. ¶¶ 37-38.)

- Plaintiff alleges that he met with Defendants Burke and Ramjattan in October 2006 to complain about "the black doll," his transfers, and discriminatory comments other co-workers allegedly made.  (Amend. Complt. ¶ 30.) Plaintiff then alleges that "apart from causing the doll to be removed, Defendants Burke and Ramjattan took no steps to remedy the other wrongs inflicted upon Plaintiff of which he complained about to them." (Amend. Complt. ¶ 31.)  However, in his administrative charge, Plaintiff

---

[4] In addition to alleging that Defendant Tracy violated the FMLA, Plaintiff also claims that these three individual defendants discriminated against him on the basis of his race, color, national origin, and disability in violation of the New York State and City Human Rights Laws; discriminated against him based on his race in violation of Section 1981; and are liable for both negligent and intentional infliction of emotional distress.

acknowledges receiving an investigation report following the October 2006 meeting.  (Sonnenberg Aff., Exhibit B.)

- Finally, Plaintiff alleges that Defendant Tracy <u>"knew of" a conversation he had with Defendant Zanlunghi in early 2004</u>, and that Defendant Tracy <u>"walked past" the black doll</u> at an unspecified date and time.  (Amend. Complt. ¶¶ 8, 10.)

Plaintiff's discrimination claims against Defendants Tracy, Burke and Ramjattan are premised entirely on his allegation that they either were merely aware of discrimination by others and/or did not address his complaints to his satisfaction (he acknowledges that they all listened and responded to his complaints).  This simply is not the kind of connection to discriminatory action meant to form the basis of individual liability under any applicable anti-discrimination law.[5]  Absent some sort of personal involvement or participation in discriminatory conduct, individuals cannot and should not be held personally liable under either New York or federal anti-discrimination laws.[6]

---

[5] To the extent that Plaintiff asserts a cause of action for intentional infliction of emotional distress against Defendants Tracy, Burke and Ramjattan, the allegations in the Amended Complaint do not come close to the outrageous conduct needed to support such a claim.

[6] Plaintiff simply dismisses the authorities cited in Defendants' moving papers on the grounds that they are summary judgment cases and therefore inapplicable.  Plaintiff misses the point.  These cases provide insight into the kinds of conduct that can and cannot form the basis for individual liability for discrimination.  They make clear that Plaintiff's allegations are insufficient as a matter of law, even if ultimately proven to be true or undisputed.  *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (dismissing Section 1981 hostile work environment claim against employer's owner where the owner was at most negligent in maintaining the employer's anti-discrimination policy because there must be "some affirmative link to causally connect the actor with the discriminatory action . . . [and the] claim . . . must be predicated on the actor's personal involvement"); *Tomka v. Seiler Corp.*, 66 F.3d at 1317 (an individual cannot be held personally liable under the NYSHRL as an employer unless shown to have any ownership interest or the power to do more than carry out personnel decisions, or if he actually participates in the discriminatory conduct); *Malaney v. El Al*

Plaintiff's reliance on *Carmody v. City of New York* as "most instructive" is curious in light of the fact that the court in that case actually dismissed all federal discrimination claims against the individually named defendants and then declined to exercise pendant jurisdiction over the remaining state laws claims. *See Carmody v. City of New York*, No. 05-cv-8084 (HB), 2006 U.S. Dist. Lexis 25308, *18 (S.D.N.Y May 11, 2006). In fact, the court specifically held that a supervisor's failure to take action upon receipt of a complaint of discrimination is *not* sufficient to impose personal liability, particularly absent allegations of gross negligence or deliberate indifference. *Id*. at *15, *citing Garrido v. Coughlin*, 716 F. Supp. 98 (S.D.N.Y. 1989) (finding that defendant's failure to respond to plaintiff's letter of protest or to request an investigation of the plaintiff's allegations was insufficient to establish liability).

With respect to Defendants Burke and Ramjattan, Plaintiff alleges only that they did not, in his opinion, respond adequately to his October 2006 complaint. He does not allege that they had (or should have had) any knowledge of discrimination of any kind prior to his complaint or that they supervised anyone who committed any act of discrimination.[7] Therefore, he argues that they should be held personally liable simply because they did not address his complaints of past discrimination to his satisfaction. Certainly Plaintiff's subjective assessment is not grounds for imposing individual

---

*Isr. Airlines*, No. 07 Civ. 8773 (DLC), 2008 U.S. Dist. LEXIS 1709, *17 n. 4 (S.D.N.Y. Jan. 4, 2008) (noting that plaintiff failed to state a claim against individual defendants under the NYSHRL and NYCHRL because the complaint did not "make any specific allegations concerning their participation in any alleged discrimination").

[7] In his opposition papers, Plaintiff states that he continued to be subject to "retaliation" by Defendant Zydryko on January 23, 2007. (Opp., p.7.) He says so in the context of discussing the personal liability of Defendants Burke and Ramjattan. He does not, however, allege any basis for concluding that Defendants Burke and Ramjattan were even aware of the January 23rd events (which allegedly took place after Plaintiff complained and after they presented him with the results of their investigation).

liability. By Plaintiff's own admission, Defendants Burke and Ramjattan removed the doll after he complained and then later issued an investigation report regarding his complaints.[8] There simply is no legal, logical or factual basis pled for Plaintiff's bold conclusion that Defendants Burke and Ramjattan are liable for "failing to intervene to stop [illegal acts]." (Opp., p.7.) Indeed, Plaintiff does not even attempt to explain how they conceivably can be held liable based on any of the examples of personal involvement in discrimination outlined in *Carmody*.

With respect to Defendant Tracy, Plaintiff has added allegations that he "knew of" one conversation that Plaintiff allegedly had with Defendant Zydrko in March 2004, and that he "walked past" the doll at some unspecified point in time. Otherwise, Plaintiff alleges that he too responded to Plaintiff's complaints of past mistreatment, but not to Plaintiff's satisfaction (assuming that "mentioning" not having a work bench even qualifies as a complaint of discrimination). Plaintiff's obvious attempt to bolster his original allegations so as to support individual liability against Defendant Tracy is to no avail. As explained above, simply failing to address Plaintiff's concerns to his complete satisfaction is not grounds for finding personal involvement in discrimination under *Carmody*. Nor does Plaintiff allege any facts from which gross negligence or deliberate indifference to ongoing discrimination reasonably can be inferred. Even taking Plaintiff's allegations to be true, there is no basis for holding Defendant Tracy personally

---

[8] Plaintiff's opposition papers misrepresent his own allegations. In the Amended Complaint, Plaintiff alleges that Defendants Burke and Ramjattan caused the doll to be removed after his October 11, 2006 meeting with them (allegedly two and half years after the doll was hung). He does not allege that they waited until January 2007 (three years after the doll was hung), as he argues in his papers. In fact, the reality is that Defendants Burke and Ramjattan removed the doll immediately following the meeting. They did, however, present Plaintiff with a full report regarding their investigation into his complaints in January 2007 (as he acknowledges in his administrative charge).

and legally responsible for a stray comment made by Defendant Zdyrko in March 2004, or for the existence of a doll that he may or may not have seen at some point and which is not alleged to have been hung by any of his subordinates.

Plaintiff has now had *two* opportunities to allege facts sufficient to impose personal liability on Defendants Tracy, Burke and Ramjattan, and he has failed to do so. Instead, his Amended Complaint makes clear that his allegations against these individuals are not based on any personal involvement in discrimination or culpable failure to respond to his complaints (because in fact they did respond), but on the mere allegation that either they were aware of past conduct or that they did not respond to his liking.

In short, Plaintiff still fails to state a claim against these three individual defendants, and they should be dismissed from this action accordingly.

## III.    Plaintiff's Negligence Claim Is Preempted By New York's Workers' Compensation Law

Plaintiff's attempt to avoid dismissal of his claim for negligent infliction of emotional distress on the ground that it is based on intentional conduct clearly misses the point. Plaintiff's intentional infliction claim (which Defendants have not moved to dismiss) is based on allegedly intentional conduct; his negligent infliction claim is by definition based on allegedly *negligent* conduct. It is well-settled that negligence claims are preempted by the New York Workers' Compensation Law. *See, e.g., Ruhling v. Tribune Co.*, cv-04-2430 (ARL), 2007 U.S. Dist. Lexis 116 (E.D.N.Y. Jan. 3, 2007) (noting that courts in the Second Circuit routinely dismiss negligence claims brought by plaintiffs in the context of complaints alleging employment discrimination); *Riester v. Lichtman*, 884 F. Supp. 751 (W.D.N.Y. 1995) (rejecting plaintiff's argument that negligent infliction claim should survive because it was based on an intentional tort and

noting that the defendant had not moved to dismiss the intentional infliction claim). Plaintiff cites no authority to the contrary. Therefore, Plaintiff's claim for negligent infliction of emotion distress also should be dismissed in its entirety.

## IV.    **Plaintiff Should Not Be Granted Leave To Further Amend His Complaint**

Plaintiff has now had two opportunities to plead facts sufficient to state any claim against Defendants Burke, Ramjattan, and Tracy. His second failure demonstrates that he cannot do so in good faith, and that granting further leave to amend would be futile. Similarly, Plaintiff cannot amend his Complaint to properly state a claim for negligent infliction of emotional distress because it simply is barred as a matter of law. Therefore, the Court should deny Plaintiff leave to further amend his Complaint.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant their motion and (1) dismiss the third cause of action in Plaintiff's Amended Complaint (FMLA) with respect to all six individual defendants, including Defendant Tracy; (2) dismiss Defendants Burke, Tracy, and Ramjattan from this action entirely; and (3) dismiss the ninth cause of action in Plaintiff's Amended Complaint (negligent infliction of emotional distress) entirely.

Dated:  New York, New York           Respectfully submitted,
        July 17, 2008                Paul, Hastings, Janofsky, and Walker LLP


        By:   /s/ Stephen P. Sonnenberg
        Stephen P. Sonnenberg (SS-4609)
        75 East 55th Street
        New York, New York 10022
        (212) 318-6000
        *Attorneys for Defendants*

TO:    Lennox S. Hinds, Esq.
        STEVENS, HINDS, & WHITE P.C.
        116 W. 111 Street
        New York, NY 10026
        (212) 864-4445
        *Attorneys for Plaintiff*

LEXSEE 2005 US DIST LEXIS 15293



Analysis
As of: Jul 17, 2008

**ANDY TROY LE WILLIAMSON, Plaintiff, v. DELUXE FINANCIAL SERVICES, INC., et al., Defendants.**

**Case No. 03-2538-KHV**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*2005 U.S. Dist. LEXIS 15293*

**July 6, 2005, Decided**

**SUBSEQUENT HISTORY:** Appeal dismissed by *Le Williamson v. Deluxe Fin. Servs., 2007 U.S. App. LEXIS 3062 (10th Cir. Kan., Feb. 8, 2007)*

**DISPOSITION:** [*1] Defendants' Motion For Summary Judgment (Doc. # 83) and defendants' Motion For Partial Summary Judgment On Plaintiff's Claim For Punitive Damages (Doc. # 85) both filed March 18, 2005 SUSTAINED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee brought suit against defendants, a former employer and several of its employees (the individual defendants), alleging that defendants terminated his employment for taking leave under the Family and Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.* Defendants moved for summary judgment and moved for partial summary judgment on the employee's claim for punitive damages.

**OVERVIEW:** Defendants asserted that the employer terminated the employee's employment because he did not call his supervisor when he was going to be late. If true, the court found that this reason constituted a legitimate non-discriminatory reason. The only fact that might have supported an inference of retaliatory motive was the close connection in time between the employee's return from FMLA leave and his termination five weeks later. However, temporal proximity, standing alone, did not raise a genuine issue of material fact whether the employer's proffered reason for firing the employee was pretextual. The individual defendants had never held

corporate officer positions with the employer. The individual defendants did not have sufficient responsibility or stature within the employer to warrant the imposition of personal liability under the FMLA. The individual defendants were not "employers" under the FMLA. Finally, defendants were entitled to summary judgment on the employee's claim for punitive damages because *29 U.S.C.S. § 2617(a)(1)(A)* limited recovery to actual monetary damages plus liquidated damages.

**OUTCOME:** The motions were sustained.

**LexisNexis(R) Headnotes**

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Pro se litigants should not succumb to summary judgment merely because they fail to comply with the technical requirements involved in defending such a motion.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admis-

sions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that a moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A factual dispute is "material" only if it might affect the outcome of the suit under the governing law. A "genuine" factual dispute requires more than a mere scintilla of evidence.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3] On a motion for summary judgment, a moving party bears the initial burden of showing the absence of any genuine issue of material fact. Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. The nonmoving party may not rest on his pleadings but must set forth specific facts.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
[HN4] A court must view the record in a light most favorable to a party opposing summary judgment. Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Family & Medical Leave Act*
*Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act*
[HN5] When analyzing Family and Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, retaliatory discharge claims, the United States Court of Appeals for the

Tenth Circuit applies the familiar burden-shifting approach set forth in McDonnell Douglas. To establish a prima facie case of retaliatory discharge under the FMLA, a plaintiff must show that (1) he engaged in activity protected by the FMLA; (2) he subsequently suffered adverse action by the employer; and (3) a casual connection connects the protected activity and the adverse employment action.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN6] Under McDonnell Douglas, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant articulates a facially legitimate reason, the burden shifts back to the plaintiff to present evidence that the defendant's proffered reason is pretextual, that is, unworthy of belief.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN7] As for temporal proximity between protected activity and termination of employment, evidence of temporal proximity may give rise to an inference of retaliation and may be probative evidence of a retaliatory motive. The question is whether temporal proximity standing alone is sufficient to raise a genuine issue of pretext. Temporal proximity is sufficient to establish the casual connection element of a prima facie case, but generally the United States Court of Appeals for the Tenth Circuit has indicated that it is not sufficient--standing alone--to raise a genuine issue of pretext. After a defendant has proffered a legitimate nonretaliatory reason for an adverse employment action, a plaintiff who survives summary judgment typically shows more than temporal proximity. In cases where temporal proximity alone is offered as evidence of pretext, courts typically have granted summary judgment in favor of the defendant.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN8] In the context of the McDonnell Douglas burden-shifting approach in employment discrimination actions, when evaluating pretext, the relevant inquiry is not whether an employer's proffered reasons were wise, fair or correct, but whether the employer honestly believed those reasons and acted in good faith upon those beliefs. Furthermore, the court's role is to prevent unlawful em-

ployment practices, not to second guess employers' business judgments.

***Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act > Coverage & Definitions > Employers***
[HN9] Under the Family and Medical Leave Act (FMLA), *29 U.S.C.S. § 2601 et seq.*, the term "employer" includes any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer. *29 U.S.C.S. § 2611(4)(A)(ii)(I)*. The FMLA regulations provide that this definition applies to individuals such as corporate officers acting in the interest of an employer. *29 C.F.R. § 825.104(d)*.

***Civil Procedure > Remedies > Damages > Punitive Damages***
***Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act > Remedies***
***Torts > Damages > Punitive Damages > Award Calculations > General Overview***
[HN10] *29 U.S.C.S. § 2617* of the Family and Medical Leave Act, *29 U.S.C.S. § 2601 et seq.*, provides for damages equal to (i) the amount of--(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee; (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated *29 U.S.C.S. § 2615* proves to the satisfaction of the court that the act or omission which violated *§ 2615* was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of *§ 2615*, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively. *29 U.S.C.S. § 2617(a)(1)(A)*. The statute limits recovery to actual monetary damages plus liquidated damages.

**COUNSEL:** Andy Troy Le Williamson, Plaintiff, Pro se, Kansas City, KS.

For Deluxe Financial Services, Inc., f/k/a Deluxe Corporation, Janelle Jordan, Ruth Ann Lewis, Keith Derks,

Defendants: Teresa L. Clark, Stinson Morrison Hecker LLP, Kansas City, MO.

**JUDGES:** Kathryn H. Vratil, United States District Judge.

**OPINION BY:** Kathryn H. Vratil

**OPINION**

**MEMORANDUM AND ORDER**

Andy Troy Le Williamson, *pro se*, brings suit against his former employer, Deluxe Financial Services ("Deluxe") and several of its employees, alleging that defendants terminated his employment for taking leave under the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.* [1] This matter is before the Court on defendants' Motion For Summary Judgment (Doc. # 83) and defendants' Motion For Partial Summary Judgment On Plaintiff's Claim For Punitive Damages (Doc. # 85), both filed March 18, 2005. For reasons stated below, defendants' motions are sustained.

> 1   The individual defendants are Janelle Harvey-Jordan, Ruth Ann Lewis and Keith Derks.

**[*2] Factual Background**

Plaintiff's opposition brief does not set forth the specific fact paragraphs in defendants' memorandum that he disputes, and plaintiff does not specifically contradict defendants' factual assertions with reference to those portions of the record on which he relies. See D. Kan. Rule 56.1. [2] Also, plaintiff does not set forth additional facts in separately numbered paragraphs. Defendants have nonetheless responded to plaintiff's additional factual statements, by assigning numbers on a copy of plaintiff's memorandum. See Reply Memorandum In Support Of Defendants' Motion For Summary Judgment (Doc. # 89) filed May 4, 2005, Ex. A.

> 2   D. Kan. Rule 56.1 provides as follows:
>
> > (b) Opposing Memorandum.
> >
> > (1) A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if appli-

cable, shall state the number of movant's fact that is disputed.

    (2) If the party opposing summary judgment relies on any facts not in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply.

[*3] The Court recognizes that [HN1] pro se litigants should not succumb to summary judgment merely because they fail to comply with the technical requirements involved in defending such a motion. See *Woods v. Roberts, 1995 U.S. App. LEXIS 3116, No. 94-3159, 1995 WL 65457, at *2 (10th Cir. Feb. 17, 1995); Hass v. U.S. Air Force, 848 F.Supp. 926, 929 (D. Kan. 1994).* The Court has therefore searched the record to determine whether genuine issues of material fact preclude the entry of summary judgment for defendants. Where supported by the record, the Court has included plaintiff's additional facts and construed them in the light most favorable to plaintiff. For purposes of defendants' motion for summary judgment, the following facts are uncontroverted, deemed admitted, or where disputed, set forth in a light most favorable to plaintiff.

The Parties

Plaintiff began work as a customer support specialist for Deluxe in September of 1999. In 2001, plaintiff worked in the Southeast Sales Region Customer Support Division in Overland Park, Kansas. Plaintiff reported to Ruth Ann Lewis, Group Lead for Southeast Sales. Lewis' group included about 20 employees who provided customer support [*4] and issue management services to support the Deluxe sales force and bank set-up for customers. Lewis reported to Keith Derks, Director of Client Data Management at the Overland Park facility. In 2001, Janelle Harvey-Jordan was the human resources manager for the Customer Support facility in Overland Park. Derks, Lewis and Harvey-Jordan have never held corporate officer positions with Deluxe. Pat Harrington was the Group HR Manager for Customer Care at a Deluxe facility in Phoenix, Arizona.

Deluxe Employment Policies

Deluxe required employees to obtain advance approval for scheduled time off. In 2001, the attendance policy provided that employees could be disciplined based on the number of "Incidents" (absences that were not scheduled and approved 24 hours in advance) and "Occurrences" (failing to clock in or out). Absenteeism and Tardiness Policy: Ex. 39; Time-Off Newsletter: Ex. 40; Harvey-Jordan Declaration P9: Ex. 51. The policy provided that before Deluxe would terminate an employee, it would give the employee a formal written warning for excessive unscheduled absences.

The Deluxe human resources policy manual provided that an employee is responsible for calling his [*5] functional manager within 30 minutes before start time to advise him or her of an unscheduled absence or lateness. The manual does not specify a particular discipline for failure to call. It provides, however, that Deluxe reserves the right to invoke discipline, up to and including termination, at any time.

Plaintiff believed that Deluxe had no policy which required him to call in ahead of time for unexpected lateness or absence. He believed that an employee had no obligation to call if he "wasn't late like most of the day." Williamson Dep. 40-41: Ex. 50. He understood, however, that an employee must call "any co-worker, your supervisor or any manager" as "soon as possible" to report that he would will be absent or late. Williamson Dep. 33, 34: Ex. 50.

Plaintiff's Employment Record

On July 3, 2000, plaintiff did not show up for work or call his supervisor, Greg Williams. On July 5, 2000, plaintiff was scheduled to work and left a voice message that he would not be coming in that day. On July 6, 2000, Williams told plaintiff that he had to call every day if he was scheduled to work, i.e., did not have leave approved in advance, and was not coming to work. Williams warned [*6] plaintiff that if he was again absent from work without calling, Deluxe would take disciplinary action up to and including termination.

On February 23, 2001, plaintiff missed work to see his doctor. Lewis, his supervisor at that time, reminded plaintiff that he needed to call when he would not be in as scheduled, so that she could plan workflow. Lewis told plaintiff that even though he disagreed with the policy, she expected him to follow it.

Between June 5 and July 12, 2001, plaintiff worked 9 full days and 3 partial days, and was absent the remaining work days. On June 5, plaintiff called Lewis at 7:30 a.m. He told her that he would be late, but he never went to work that day. On June 11, plaintiff told Lewis that because he had relationship problems, he would be absent "indefinitely." On June 12, plaintiff saw therapist

Jeff Crawford, who gave him a note excusing him from work from June 4 through June 20, 2001. On June 18, 2001, Deluxe sent plaintiff an FMLA notice letter and an FMLA medical certification form. The FMLA notice directed plaintiff to return the completed medical certification form no later than 15 days after he received the notice.

During 2001, The Hartford was [*7] a third-party administrator of Deluxe's short-term disability plan. The Hartford independently determined whether a Deluxe employee was entitled to short-term disability benefits, based on medical information which the employee or the employee's health care provider provided. The Hartford approved short-term disability benefits for plaintiff for June 5 through June 19, 2001. Plaintiff returned to work on June 21, 2001.

On June 27, 2001 plaintiff sent an e-mail to his team members. It was titled "Welcome Back!" and stated as follows:

> I would like to say thanks. Thanks for leaving me in the IMS distro by myself after 12:00 pm. Thanks for the extra work last week. Makes me wonder why I missed so many days from the start.

6/27/2001 Williamson e-mail: Ex. 14; Lewis Declaration P12: Ex. 52. Plaintiff worked a few days in early July, then stopped working again on July 13. From July 13 to September 17, 2001, plaintiff did not work at all. [3] He saw a counselor, James Roberts, who refused to provide medical certification that plaintiff was medically unfit to remain off work. On July 19, Lewis and Harvey-Jordan called plaintiff to tell him that he was on final warning for absences [*8] because he had not returned his FMLA paperwork. Plaintiff said that he thought he would return to work on July 23. Within a few days, plaintiff told Lewis that he had seen a doctor, but that the doctor would not write an excuse to cover his absences. On July 24, Deluxe sent plaintiff a second FMLA notice.

> 3   Plaintiff does not recall any of his daily activities during his extended absence, other than fishing (one time), visiting a Deluxe co-worker when she had a party, contacting his doctors and writing letters to his college professors.
>
> During this time, plaintiff may have participated in college classes at Park University. He initially testified that he did not attend college classes during his absence and "did not do any work." He then testified that he participated in on-line classes during August and September. He later testified that he did not take classes in Au-

gust and September but that he participated in classes in June and July of 2001.

On August 9, 2001, The Hartford denied plaintiff's request for [*9] short-term disability benefits because it had not received medical information to support the request. Plaintiff saw Dr. Cedric Fortune on August 2 and 16. On August 10, plaintiff sent The Hartford a note signed by Dr. Fortune. Dr. Fortune diagnosed plaintiff with depressive anxiety and stated that he was unable to work for a period of six weeks beginning July 13, 2001.

On August 16, 2001, Deluxe sent plaintiff a third FMLA notice. On August 29, The Hartford granted plaintiff short-term disability benefits to August 31, and Deluxe approved as FMLA leave the absences from July 13 to August 31. Although Deluxe expected plaintiff to return to work on August 31, he did not.

During the week of September 3, 2001, plaintiff agreed to call Lewis before the start of his shift on September 10 to let her know whether he would becoming back to work that day. On September 10, plaintiff called Lewis almost two hours after his shift began and said that he would not be in. Lewis reminded plaintiff that he was required to notify her by his starting time whether he was going to return to work. Plaintiff said that he had a doctor's appointment later that day. Lewis asked plaintiff if he thought [*10] that there was a chance he would be back that week and he said, "no." Lewis asked plaintiff to follow up with her once he talked with his doctor because his short-term disability was not approved past August 31, 2001. Plaintiff stated that he understood that he was responsible to call before his shift when he would not be in.

On September 11, 2001, plaintiff saw Dr. Fortune, who completed a form stating that plaintiff suffered from depression and was approved to return to work on September 17. On September 13, plaintiff left a voice message for Lewis, stating, "I've got bad news for you -- the bad news is that I will be back next Monday and you will have to put up with me -- I guess." On September 17, plaintiff returned to work. Although Deluxe had not yet received any FMLA medical certification, it approved his extended absence as FMLA leave. Deluxe also removed the disciplinary incidents which plaintiff had received for his absences. [4]

> 4   On September 26, 2001, plaintiff faxed to The Hartford and Deluxe the FMLA medical certification form which Dr. Fortune had signed on September 11. On September 28, The Hartford extended plaintiff's short-term disability to September 16.

[*11] On September 17, 2001, Lewis sent the following e-mail to all team members regarding plaintiff's return to work:

> Today, Troy joins in the Southeast. You may want to take a few moments to welcome him back and bring him up to date with activities within our team.

9/17/2001 Lewis e-mail: Ex. 27; Lewis Declaration P27: Ex. 52. Plaintiff responded with the following e-mail:

> Hi Team, Thanks for all your help and support. I would say I missed the place, but let's keep it real. Who misses work! On the other hand, I do miss the friends, therefore it makes it worth while coming back to work.

9/17/2001 Williamson e-mail: Ex. 27; Lewis Declaration P28: Ex. 52. That same day, Lewis and Derks met with plaintiff. They stressed that if plaintiff was scheduled to work but was not going to be at work, he must let Lewis know because "if [you say you are] going to be here, we, as a business, are planning on that." Derks mentioned that there were a couple of times when plaintiff had said that he was going to return to work, and then did not. Derks explained that plaintiff had to keep Lewis informed when he was going to be out, and that it was plaintiff's responsibility [*12] to call her.

On September 18 -- the day after plaintiff returned to work following his two-month absence -- plaintiff asked to leave early to complete a final exam. On September 21, plaintiff was scheduled for a one-on-one conference with his supervisor, but he did not show up.

On October 23, 2001, Deluxe approved plaintiff's request to leave work early (at 1:30 p.m. on October 24) to take a test. On October 24, plaintiff did not show up for work as scheduled, at 8:00 a.m. He therefore missed a regularly scheduled monthly team meeting that morning. Plaintiff called at 10:15 a.m. and left a voice message that he was coming in late. He arrived at work at 11:57 a.m. and left at 1:30 p.m. [5] That day, Lewis conferred with Derks and Harvey-Jordan about terminating plaintiff's employment. The group reviewed documents concerning plaintiff's history of not calling in when he was scheduled to be at work and was going to be late or absent. Lewis, Derks, Harvey-Jordan and Harrington decided to terminate plaintiff's employment. On October 25, Lewis told plaintiff that Deluxe was terminating his employment because he did not call his supervisor before the start of his scheduled shift when he [*13] was going to be late on October 24, 2001. [6]

5 No one at Deluxe asked plaintiff why he came in late. After it terminated plaintiff, Deluxe found out that plaintiff stated that he was late that day because he had overslept.

6 Deluxe did not discharge plaintiff for violating Deluxe's attendance policy regarding the number of "Incidents" or "Occurrences." Rather, it terminated his employment for not calling to notify his manager of unscheduled time off.

In the pretrial order plaintiff identified two Deluxe employees -- Danielle Gatlin and Kimberly Johnson -- who were not discharged even though they went in late on several occasions without calling before their scheduled times. Plaintiff has not produced any admissible evidence, however, to support this assertion. [7]

7    Plaintiff offers unauthenticated unsworn statements regarding these two employees. The Court will not consider these documents. See *Stevens v. Deluxe Fin. Servs., Inc.*, 199 F. Supp. 2d 1128, 1133 n.6 (D. Kan. 2002).

[*14] In 2001, Deluxe granted FMLA leave to approximately 40 employees in the Customer Support Department where plaintiff worked. At least six of those persons received more FMLA leave time than plaintiff did. Deluxe employees who received FMLA leave in 2001 received leave time which ranged from 1.8 hours to more than 800 hours of leave. Of the employees who took FMLA leave in 2001, plaintiff is the only employee who was discharged within 60 days of return from FMLA leave.

Plaintiff asserts that Deluxe terminated his employment because he asserted FMLA rights. Defendants assert that they are entitled to summary judgment because plaintiff cannot show that the stated reason for termination was pretextual. The individual defendants, Janelle Harvey-Jordan, Ruth Ann Lewis and Keith Derks, alternatively contend that they are entitled to summary judgment because as a matter of law they are not employers under the FMLA. Finally, defendants assert that they are entitled to summary judgment on plaintiff's claims for punitive damages because the FMLA does not authorize such damages.

**Summary Judgment Standards**

[HN2] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, [*15] and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202,

*106 S. Ct. 2505 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).* A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248.* A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id. at 252.*

[HN3] The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991).* Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990);* [*16] see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).* The nonmoving party may not rest on his pleadings but must set forth specific facts. *Applied Genetics, 912 F.2d at 1241.*

[HN4] The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. See *Anderson, 477 U.S. at 250-51.* "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).* Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. [*17] " *Anderson, 477 U.S. at 251-52.*

**Analysis**

Defendants assert that they are entitled to summary judgment because Deluxe has articulated a legitimate, non-retaliatory reason for termination and plaintiff cannot show that it is pretextual. The individual defendants contend that they are also entitled to summary judgment because as a matter of law they are not employers under the FMLA. Finally, defendants assert that in any event they are entitled to summary judgment on plaintiff's claims for punitive damages because the FMLA does not authorize such damages.

**I. Evidence of Pretext**

Plaintiff alleges that Deluxe terminated his employment in retaliation for using FMLA leave. Defendants assert that Deluxe had a legitimate, non-retaliatory reason to terminate his employment and that plaintiff has not met his burden of showing a genuine dispute of material fact whether that reason is pretextual. Plaintiff responds that the temporal proximity between his FMLA leave and his termination creates a genuine issue of pretext which precludes summary judgment.

[HN5] When analyzing FMLA retaliatory discharge claims, the Tenth Circuit applies the familiar burden-shifting [*18] approach set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* See, e.g., *Richmond v. ONEOK, Inc., 120 F.3d 205, 208 (10th Cir. 1997).* To establish a prima facie case of retaliatory discharge under the FMLA, plaintiff must show that (1) he engaged in activity protected by the act; (2) he subsequently suffered adverse action by the employer; and (3) a causal connection connects the protected activity and the adverse employment action. See *id. at 209.* Defendants concede that plaintiff has established a prima facie case. See Memorandum In Support Of Defendants' Motion For Summary Judgment (Doc. # 84) at 21.

[HN6] Under McDonnell Douglas, once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its actions. See *Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001).* If defendant articulates a facially legitimate reason, the burden shifts back to plaintiff to present evidence that defendant's proffered reason is pretextual, that is, "unworthy of belief." *Id. at 1120.* Here, defendants assert that [*19] Deluxe terminated plaintiff's employment because he did not call his supervisor when he was going to be late on September 24, 2001. If true, this reason constitutes a legitimate non-discriminatory reason.

To survive summary judgment, plaintiff must produce evidence that defendants terminated his employment because he took FMLA leave. Plaintiff contends that when viewed in totality, the following circumstantial evidence raises a genuine issue of material fact whether defendants' reason was pretextual: (1) close temporal proximity between plaintiff's return from FMLA leave and the termination of his employment; (2) company policy, which did not provide that employees could be fired for failing to call in for unscheduled tardiness or absence from work; (3) defendants' failure to warn him that failure to call in when he was going to be late could lead to termination; and (4) defendants' failure to discipline him on past occasions when he did not call in on a day when he had an unscheduled tardy or absence. Defendants respond that close temporal proximity, standing alone, is insufficient to rebut their evidence of a legiti-

mate, non-discriminatory reason for termination. Defendants also [*20] argue that plaintiff has produced no other admissible evidence that its preferred reason is pretextual.

The Court agrees that plaintiff has produced no evidence that company policy prohibited Deluxe from terminating employees for failure to call in for unscheduled tardiness or absence from work. Furthermore, plaintiff has produced no evidence that Deluxe failed to warn him that he could be fired if he did not call. Deluxe has produced evidence that it required employees to notify their supervisors when they were not going to report on time on days when they were scheduled to work, and that it could terminate employees for failing to do so. Plaintiff also asserts that Deluxe did not discipline him for prior breaches, but Deluxe points to evidence that when plaintiff did not call in to report that he would be late or absent, plaintiff's supervisor informed him that he needed to do so. On several occasions, plaintiff's supervisor reprimanded him verbally or in writing. While Deluxe did not fire him on those occasions, such oral or written reprimands do constitute disciplinary action.

[HN7] As for temporal proximity between protected activity and termination of employment, evidence of temporal [*21] proximity may give rise to an inference of retaliation and may be probative evidence of a retaliatory motive. See *id. at 1398*. The question is whether temporal proximity *standing alone* is sufficient to raise a genuine issue of pretext. This Court recently addressed just this question in *Hysten v. Burlington N. Santa Fe Ry. Co., 372 F. Supp. 2d 1246, 2005 WL 1388043 (D. Kan. 2005)*. The Court noted that temporal proximity is sufficient to establish the causal connection element of a prima facie case, but that generally the Tenth Circuit has indicated that it is not sufficient -- standing alone -- to raise a genuine issue of pretext. See *Annett v. Univ. of Kan., 371 F.3d 1233 (10th Cir. 2004); Pastran v. K-Mart Corp., 210 F.3d 1201 (10th Cir. 2000); Vigil v. Colo. Dep't of Higher Educ., 1999 U.S. App. LEXIS 13641, 1999 WL 407479 (10th Cir. June 21, 1999)* (unpublished opinion) (temporal proximity of adverse employment action may cast doubt on defendant's termination justification but is not dispositive of pretext analysis). In Annett, the Tenth Circuit expressly declined to allow very close temporal proximity to operate as a proxy for [*22] the more demanding evidentiary requirement in the pretext analysis. *371 F.3d at 1241*.

After a defendant has proffered a legitimate nonretaliatory reason for an adverse employment action, a plaintiff who survives summary judgment typically shows more than temporal proximity. See, e.g., *Sanjuan, 160 F.3d 1291* (evidence of pretext shown through temporal proximity, defendant's "cost per injury" goals and accident-free incentive programs and plaintiff's testi-

mony regarding mistreatment); *McClurg v. GTECH Corp., 61 F. Supp.2d 1150, 1164 (D. Kan. 1999)* (issue of pretext established by temporal proximity of less than two months, mention of workers' compensation claim in termination meeting, defendant's decision not to forward medical bill for payment and termination of employee after error on first attempt to type in new computer program command); *Austin v. Haaker, 76 F.Supp.2d 1213 (D. Kan. 1999)* (temporal proximity established causal connection; ambiguity in employment agreement created genuine issue of material fact); *Chaparro v. IBP, Inc., 873 F. Supp. 1465 (D. Kan. 1995)* (evidence of temporal proximity, [*23] defendant's refusal to excuse absence despite doctor's note, change of absences from excused to unexcused, assignment of employee to job that employer knew employee could not perform). In cases where temporal proximity alone is offered as evidence of pretext, courts typically have granted summary judgment in favor of defendant. See *Pacheco v. Whiting Farms, Inc., 365 F.3d 1199 (10th Cir. 2004)* (summary judgment affirmed where no evidence of pretext except adverse employment action within two months of protected activity); *Lewis v. Okla. ex rel. Bd. of Regents, 42 Fed. Appx. 160, 2002 WL 1316810 (10th Cir. June 18, 2002)* (unpublished opinion) (summary judgment affirmed where temporal proximity shown but other evidence did not support inference of pretext); *Conner, 121 F.3d 1390, 1396 (10th Cir. 1997)* (granting summary judgment where no evidence of pretext aside from temporal proximity); *Robinson v. Wilson Concrete Co., 913 F. Supp. 1476 (D. Kan. 1996)* (timing of termination alone insufficient to show pretext).

[HN8] When evaluating pretext, the relevant inquiry is not whether the employer's proffered reasons were wise, [*24] fair or correct, but whether the employer honestly believed those reasons and acted in good faith upon those beliefs. *Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004); Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999)*, overruled on other grounds by *AMTRAK v. Morgan, 536 U.S. 101, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002)*. Furthermore, the Court's role is to prevent unlawful employment practices, not to second guess employers' business judgments. *Simms v. Oklahoma, 165 F.3d 1321, 1329 (10th Cir. 1999)*. Here, the only fact which might support an inference of retaliatory motive is the close connection in time between plaintiff's return from FMLA leave on September 17, 2001 and his termination five weeks later, on October 25, 2001.

The Tenth Circuit has clearly stated in multiple opinions that temporal proximity gives rise to an inference of retaliation but that it is not sufficient -- standing alone -- to raise a genuine issue of pretext. As this Court noted in Hysten, an arguable exception is *Foster v.*

*AlliedSignal, 293 F.3d 1187 (10th Cir. 2002)*. To the extent that opinion implies [\*25] that temporal proximity is sufficient for purposes of the pretext analysis, it appears to be inconsistent with both prior and subsequent Tenth Circuit opinions. See *Annett, 371 F.3d at 1233; Pastran, 210 F.3d at 1201*.

In Foster, plaintiff suffered a work-related injury and did not report to work for several days. *293 F.3d at 1191*. She later filed a workers' compensation claim, and the employer fired her nine days later, *id. at 1191-92*, allegedly for violating attendance policy. Plaintiff filed suit, claiming that the employer had retaliated against her for filing a workers' compensation claim, in violation of Kansas law. The district court granted summary judgment in favor of defendant, and the Tenth Circuit reversed. In doing so, it stated as follows:

> In order to affirm summary judgment for AlliedSignal, we must conclude that Foster "failed to produce any evidence from which a reasonable inference could be drawn" that AlliedSignal's proffered reasons for her firing were pretextual. Particularly given that "close proximity in time may provide some probative evidence of retaliatory intent," we cannot conclude [\*26] that Foster has failed to meet her burden at the summary judgment stage.

*Id. at 1196* (citations omitted). The Tenth Circuit emphasized that in addition to temporal proximity, plaintiff had presented evidence that (1) her absences were due to a work-related injury, and (2) company personnel either knew or should have known the absences were work-related. *Id. at 1195-96*. The latter factors seem to merely reiterate two elements of plaintiff's prima facie case which were not at issue in Foster. Therefore it is difficult to ascertain what evidence, in addition to temporal proximity and the other elements of her prima facie case, allowed plaintiff to escape summary judgment. This Court cannot reconcile Foster with Annett and Pastran, but it confines it analysis to the context in which it arose: a claim for retaliatory discharge under the common law of the state of Kansas.

As noted, in this case the only evidence of pretext is the temporal proximity between plaintiff's return from FMLA leave and his termination. Plaintiff returned on September 17, 2001 and Deluxe terminated his employment on October 25, 2001. This time (approximately [\*27] five weeks) is not as close as in Foster (in which the employer terminated plaintiff's employment within a week of notice that she had filed a worker's compensa-

tion claim). Also, it is not as close as in Hysten (where defendant initiated the investigation which led to plaintiff's termination immediately after he stated that he had suffered a work-related injury forty-five days earlier). Here, temporal proximity, standing alone, does not raise a genuine issue of material fact whether Deluxe's proferred reason for firing plaintiff was pretextual. Defendants are therefore entitled to summary judgment.

## II. Individual Defendants as Employer Under FMLA

The individual defendants assert that they are not subject to FMLA liability because they are not employers under the FMLA. [HN9] Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer." *29 U.S.C. § 2611(4)(A)(ii)(I)*. The FMLA regulations provide that this definition applies to "individuals such as corporate officers acting in the interest of an employer." *29 C.F.R. § 825.104(d)* [\*28] (same standard as "employer" under the Fair Labor Standards Act, *29 U.S.C. § 203(d)*).

Lewis supervised about 20 employees. She reported to Derks, who was director of client data management at the Overland Park facility. Harvey-Jordan was HR Manager for the Customer Support facility in Overland Park. Derks, Lewis and Harvey-Jordan have never held corporate officer positions with Deluxe. They did not have sufficient responsibility or stature within Deluxe to warrant the imposition of personal liability under the FMLA. See *Brunelle v. Cytec Plastics, Inc., 225 F. Supp.2d 67 (D. Me. 2002)* (front-line supervisor who was personally responsible for decisions that contributed to denial of FMLA leave not prominent enough player in employer's operations to be considered "employer" under FMLA); see *Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991)* (under economic reality test, corporate officer with operational control of corporation's covered enterprise was employer under FLSA). The Court agrees that the individual defendants are not "employers" under the FMLA, and that they are entitled to summary judgment for this [\*29] additional reason.

## III. Punitive Damages

Defendants alternatively assert that they are entitled to summary judgment on plaintiff's claim for punitive damages because punitive damages are not recoverable under the FMLA. [HN10] The FMLA, *29 U.S.C. § 2617* provides for damages equal to

> (i) the amount of--

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section [*30] 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively[.]

*29 U.S.C. § 2617(a)(1)(A)*. The statute limits recovery to actual monetary damages plus liquidated damages. See *Walker v. UPS, 240 F.3d 1268, 1278 (10th Cir. 2001)* (recovery under FMLA limited to actual monetary loss). Defendants are entitled to summary judgment on plaintiff's claim for punitive damages.

**IT IS THEREFORE ORDERED** that defendants' Motion For Summary Judgment (Doc. # 83) and defendants' Motion For Partial Summary Judgment On Plaintiff's Claim For Punitive Damages (Doc. # 85) both filed March 18, 2005 be and hereby are **SUSTAINED.**

Dated this 6th day of July, 2005 at Kansas City, Kansas.

Kathryn H. Vratil

United States District Judge

LEXSEE 2008 US DIST LEXIS 1709



Cited
As of: Jul 17, 2008

**ANJALI MALANEY, Plaintiff, -v- EL AL ISRAEL AIRLINES, YOSSI BENBAS-
SAT, HANNA WOSKOBOINIK, MICHAEL MAYER, JOHN BALZER AND
HAIM ROMANO, Defendants.**

**07 Civ. 8773 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2008 U.S. Dist. LEXIS 1709*

**January 4, 2008, Decided
January 4, 2008, Filed**

**COUNSEL:** **[*1]** Anjali Malaney, Plaintiff, Pro se,
Wayne, New Jersey.

For Defendants: Roger H. Briton, Kathryn J. Russo,
Jackson Lewis LLP, Melville, New York.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

*Pro se* plaintiff Anjali Malaney brings this employ-
ment discrimination lawsuit against her former employer,
El Al Israel Airlines, and several of its employees under
Title VII, the New York State Human Rights Law
("NYSHRL") and the New York City Human Rights
Law ("NYCHRL"). Defendants move to dismiss all
claims based on Malaney's execution of an allegedly
valid release. Further, defendants move to dismiss the
Title VII claims against all individual defendants because
they argue that there is no individual liability under Title
VII, and to dismiss the claims under the NYSHRL and
NYCHRL against individual defendants Michael Mayer,
John Balzer, and Haim Romano because the Complaint
fails to allege these defendants' actual participation in the
purported discriminatory conduct. In the alternative, de-
fendants request that their motion to dismiss be con-

verted into a motion for summary judgment, and that
summary judgment be granted in their favor. The motion
**[*2]** to dismiss is converted into a motion for summary
judgment, and defendants' motion for summary judgment
is granted.

BACKGROUND

The following facts are taken from the Complaint. [1]
Malaney, who is Hindu and of Indian descent, began
work at El Al Israel Airlines on April 27, 1992 as a ticket
agent. She worked in that position until February 28,
2007, when she resigned. The facts surrounding her res-
ignation give rise to the instant dispute.

1 Malaney initiated this action by filing a form
Complaint for Employment Discrimination along
with several supporting documents, including her
submissions to the United States Equal Employ-
ment Opportunity Commission (EEOC); the
EEOC's response to her claim, which found that
the information contained in "Malaney's com-
plaint did not "establish[] a violation of federal
law" on the part of defendants; a copy of the El
Al 2006 Voluntary Severance Program Separa-
tion Agreement and General Release; correspon-
dence between Malaney and defendant Yossi
Benbassat; grievance forms submitted by Ma-
laney; and a letter of recommendation for Ma-
laney, written by defendant John Balzer. Under
*Federal Rule of Civil Procedure 12(b),* "the com-
plaint is deemed to include any written **[*3]** in-

strument attached to it as an exhibit or any state-
ments or documents incorporated in it by refer-
ence." *Int'l Audiotext Network, Inc. v. Am. Tel. &
Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per cu-
riam)* (citation omitted); *see Fed. R. Civ. P. 10(c)*
("A copy of any written instrument which is an
exhibit to a pleading is a part thereof for all pur-
poses."). The instant Complaint thus includes
Malaney's form complaint and all attached docu-
ments, as well as her severance program election
form, which was "incorporated into [Malaney's
complaint] by reference," *Int'l Audiotext Network,
Inc., 62 F.3d at 72*, but was submitted by defen-
dants with their motion to dismiss.

In late October 2006, Malaney was told that her job
as a ticket agent was being eliminated and that the El Al
reservation and ticket office was closing because the
work was being transferred to Israel. Yossi Benbassat, El
Al's human resources director, presented Malaney with a
Voluntary Severance Agreement (the "Agreement"),
under which El Al would pay Malaney a lump sum pay-
ment in exchange for her resignation. Under the Agree-
ment, El Al employees choosing to participate in the
voluntary severance program were required to submit
[*4] an election form by November 27, 2006. In addi-
tion, on their last day of work, participating employees
were required to execute a release "forever discharg[ing]
Employer" from liability for a variety of legal claims,
including those under Title VII, the NYSHRL, and the
NYCHRL. The election form and release were provided
to the employees simultaneously. The release -- but not
the election form -- contained a revocation clause, per-
mitting an employee to "revoke this Agreement for a
period of 7 days following the day he or she executes this
Agreement."

Malaney submitted a signed election form on No-
vember 27, 2006. Presumably referring to the company's
plans to close the New York ticketing office, Malaney
wrote at the bottom of the election form, "[P]lease keep
in mind if the position of the company changes I would
like to continue to work for El Al. I consider myself a
valued and a loyal employee. . . ." Four days later, on
December 1, Malaney emailed Benbassat and informed
him that her "decision to take the severance or company
buyout proposal is based on the statement you made to
the employees in the kitchen two weeks ago that the of-
fice is closing on February 28th 2007." She inquired
[*5] whether the office was in fact closing, and asked for
written confirmation that the reservation and ticket office
would be "completely dissolved and closed by Feb[.] 28,
2007." Also on December 1, Benbassat sent Malaney a
memorandum (the "December 1 Memorandum") con-
firming her election to participate in the voluntary sever-
ance program and informing her that her last day of em-

ployment with El Al would be February 28, 2007, on
which date she would receive severance in the amount of
$ 21,408.06, should she execute the release that day and
not revoke it thereafter, presumably within the seven-day
revocation period spelled out in the release.

On December 3, Malaney sent a fax to Benbassat,
which read: "Please be advised that I am hereby *with-
drawing* my resignation dated Nov[.] 27, 2006." Having
received no reply from Benbassat, Malaney again
emailed him on December 7, requesting confirmation
that he had received her December 3 fax. Later that day,
Benbassat emailed Malaney and informed her that she
could not withdraw her resignation because the election
form had no provision authorizing withdrawal. On De-
cember 8, Malaney signed the December 1 Memoran-
dum "to confirm [her] understanding of [*6] [its] terms."

Malaney filed a grievance with her union on January
2, 2007, complaining "that the company is downsizing
*but not closing* on Feb[.] 28, 2007." She alleged that
other El Al employees who elected to participate in the
voluntary severance program were given termination
dates in April and June 2007, and some were offered
other positions in the company. [2] The grievance did not
allege discrimination on the basis of any category pro-
tected by Title VII.

2    In her pleadings, Malaney does not indicate
the outcome of her grievance.

On February 28, 2007, Malaney's last day at work,
Benbassat sent her two separate communications. First,
he sent her a memorandum informing her that her sever-
ance package had been recalculated at $ 26,760.08, less
lawful deductions. Malaney signed the memorandum
confirming her understanding of its terms, but attached a
copy of an email she had sent to Benbassat earlier that
day informing him that she had been "misinformed" and
was "signing the severance letter under duress and pro-
test." Second, Benbassat sent Malaney a memorandum
informing her that, in order to be eligible for severance
and medical benefits, she was required to sign a release
"without condition [*7] or comment," referring to the
email she had sent earlier that day. Malaney signed the
general release; in her Complaint, she reiterates that she
did so "under duress and protest." Malaney claims that
Benbassat "threatened . . . that if I did not sign the gen-
eral release I will not receive the lump sum payment, no
unemployment benefits and that I could not return to
work. After being a loyal hard working employee, Mr.
Benbassat was ready to dismiss me with nothing unless I
signed the final papers." Malaney accepted her severance
package from El Al and resigned her position. She did
not attempt to revoke the release, nor did she attempt to
return the severance package. In addition, defendant John

Balzer, Malaney's supervisor, provided her with a letter of recommendation for future employment.

Malaney returned to El Al's New York office on March 29 after a job interview with Air India. According to Malaney, when she told defendant Hanna Woskoboinik about her interview, Woskoboinik "said she was going to contact Air India and advise them *not* to hire" Malaney. According to Malaney, "Air India never got back to me regarding employment opportunities, because Hanna had more than likely[] contacted **[*8]** the managers she knows at Air India."

Malaney filed a complaint with the EEOC in April 2007, in which she alleged that the voluntary severance program offered to her was "just a ploy" to solicit her resignation and reduce the number of non-Jewish employees at El Al. Although her complaint to the EEOC was not submitted in the instant action, it is apparent from the EEOC's letter to Malaney (which was submitted) that Malaney made the following additional allegations: (1) that she was "passed up" for positions within the company in favor of Jewish employees; (2) that, contrary to El Al's representation that Malaney's position was being eliminated, someone was hired to replace her upon her resignation, and other employees were being cross-trained to fill ticketing positions in New York City; and (3) that she was discriminatorily denied flight benefits, while similarly situated Jewish employees were afforded those benefits. El Al denied all Malaney's allegations, and on September 28, 2007, the EEOC issued its response to her complaint, stating that "the Commission is unable to conclude that the information establishes a violation of federal law on the part of Respondent." The EEOC noted **[*9]** further that its finding of no federal violation "does not certify that the Respondent is in compliance with the statutes."

Plaintiff filed this action on October 11, 2007. She claims that she was discriminated against on the basis of her race (which she lists as "Asian Indian"), national origin (India), and religion (Hindu), in violation of Title VII, the NYSHRL, and the NYCHRL. Specifically, she claims she was subjected to discriminatory termination of her employment, unequal terms and conditions of employment, forced resignation, and retaliation. Malaney named El Al Airlines, Benbassat, Woskoboinik, and Balzer as defendants, in addition to El Al president Haim Romano and Michael Mayer, who, according to defendants, is a former El Al employee who now lives in Israel. [3]

> 3  Defendants claim that Benbassat accepted service of Malaney's Complaint on behalf of himself, El Al, Woskoboinik, and Balzer. He declined to accept service on behalf of Mayer or Romano. Defendants represent that, "[t]o the best

of Mr. Benbassat's knowledge, Defendants Mayer and Romano have not been served with the Complaint." In her opposition papers, Malaney attests that she has served both Mayer and Romano via United **[*10]** States Postal Service. Because this action must be dismissed in any event, it is unnecessary to resolve whether Mayer and Romano have been served.

## DISCUSSION

### I. Conversion to a Motion for Summary Judgment

Defendants move to dismiss or, in the alternative, for summary judgment on Malaney's Complaint based on her execution of an allegedly valid release discharging El Al and its employees from liability under Title VII, the NYSHRL, and the NYCHRL. A district court has discretion to convert a motion to dismiss into a motion for summary judgment, *see In re G & A Books, Inc., 770 F.2d 288, 294-95 (2d Cir. 1985)*, but must ordinarily give notice to the parties before such conversion, *see Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)*. "A party is deemed to have notice that a motion may be converted," however, "if that party should reasonably have recognized the possibility that such a conversion would occur." *Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004)* (citation omitted).

On October 31, 2007, twenty days after Malaney filed her complaint, defendants provided Malaney with notice of their intention to convert their motion to dismiss into one for summary judgment, alerting her that the **[*11]** claims asserted in her complaint "may be dismissed without a trial if you do not respond to this motion by filing your own sworn affidavits or other papers as required by *[Federal] Rules [of Civil Procedure] 12(b)* and *56(e)*." In her responsive pleadings, Malaney submitted, *inter alia*, a sworn fourteen-paragraph affirmation reciting her version of the facts of the case and a copy of El Al's submission to the EEOC in opposition to her charge.

Thus, plaintiff had adequate notice of the summary judgment motion and submitted extensive evidence with her complaint and in opposition to the motion. Accordingly, she "should reasonably have recognized the possibility that the motion might be converted to one for summary judgment," and was not "taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading." *In re G&A Books, Inc., 770 F.2d at 295*. The motion to dismiss will therefore be converted to one for summary judgment pursuant to *Federal Rule of Civil Procedure 56*.

### II. Validity of the Release

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is **[*12]** entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).* When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. *Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.* Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

Defendants observe that the release that Malaney signed on her last day of work, February 28, 2007, specifically discharged El Al and its current and former employees of all liability under, *inter alia,* Title VII, the NYSHRL, and the NYCHRL, as well as under **[*13]** common law and tort law. Although the release includes a revocation clause, defendants argue -- and Malaney does not dispute -- that she made no effort to revoke the release. Indeed, defendants aver -- and, again, Malaney does not dispute -- that she accepted the previously agreed upon package of severance pay and medical benefits and resigned her position with the airline. Malaney appears to argue that because she attempted to revoke her *election* to participate in the severance program, her release should be invalidated and she should be permitted to proceed on her employment discrimination claims.

As the Second Circuit has noted, "the validity of a release is a peculiarly fact-sensitive inquiry." *Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437-38 (2d Cir. 1998).* A court must employ a "totality of the circumstances test to determine whether a release of Title VII claims is knowing and voluntary." *Id. at 438* (citation omitted). Relevant factors to be considered by the court in assessing the totality of the circumstances include:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing **[*14]** it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agree-

ment, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* "In addition, courts have considered a seventh factor -- whether the employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so." *Id.*

In the instant case, as defendants persuasively argue, each of these factors, with the exception of the third, militates in favor of finding a valid release. Malaney worked for El Al for sixteen years and, according to the letter of recommendation written on her behalf by Balzer, was "an able employee and an extremely hard worker." She was in possession of the release for at least four months -- from October 27, 2006, when it was distributed to El Al employees, to February 28, 2007, when she executed it. The language of the release is pellucidly clear; indeed, Malaney makes no argument based on the ambiguity of the language. The release advises employees to consult with **[*15]** an attorney, stating in capital letters that employees are "ADVISED IN WRITING TO CONSULT WITH AN ATTORNEY PRIOR TO EXECUTING THIS SEPARATION AGREEMENT AND GENERAL RELEASE." Finally, Malaney received severance pay and medical benefits in exchange for executing the release. According to defendants, she would not have otherwise received any severance benefits had she been terminated for any other reason and not pursuant to the voluntary severance program. As to the third factor, defendants concede that Malaney "played no role in deciding the terms of the Release." But as the Second Circuit has recognized, this fact alone does not necessarily create an issue of fact as to voluntariness. *See Bormann v. AT&T Communications, Inc., 875 F.2d 399, 403 n.1 (2d Cir. 1989).*

Whatever Malaney may have tried to do to revoke her election of participation in the voluntary severance program is irrelevant to her execution of a valid release, and she has offered no evidence indicating that the release was in any way invalid. Indeed, in her opposition to defendants' motion, Malaney did not take issue with any of defendants' evidence concerning the validity of the release or Malaney's execution of it. As **[*16]** the facts relating to each of the factors enumerated above are within Malaney's control and need not be procured through discovery, her failure to request discovery on these issues is not surprising. Because she does not dispute El Al's characterization of her education and business experience, or of the various features of the release

and severance program that factored into the analysis performed above, summary judgment must be granted in defendants' favor on all claims arising from conduct pre-dating the release.

Malaney alleges one act of discrimination that post-dates the release, to wit, Hanna Woskoboinik's allegedly retaliatory communication with Air India concerning Malaney's potential employment there. Malaney claims that Woskoboinik "said she was going to contact Air India and advise them *not* to hire" Malaney. According to Malaney, Air India never contacted her after her interview "because Hanna had more than likely[] contacted the managers she knows at Air India."

In order to establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and **[*17]** (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).* Malaney's retaliation claim fails because she has not alleged her participation in any protected activity. None of the complaints Malaney made about her allegedly forced resignation raised the specter of discrimination. Rather, her communications with Benbassat and her January 2 union grievance stated only that she had been misinformed that her position was being eliminated and that she wished to remain employed at El Al. Such communication, because it does not concern an unlawful employment practice, is not protected activity and cannot give rise to an unlawful retaliation claim. *See McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001).* Accordingly, summary judgment with respect to Malaney's retaliation claim is granted in defendants' favor. [4]

> 4   In light of the grant of summary judgment in defendants' favor on all claims, defendants' arguments concerning the viability of Malaney's claims against individual defendants under Title VII, the NYSHRL, and the NYCHRL need not be reached. Nonetheless, it may be noted that **[*18]** as to Title VII, Malaney cannot state a claim against the individual defendants because "an individual defendant cannot be held personally liable under Title VII." *Schiano v. Quality Payroll*

*Systems, Inc., 445 F.3d 597, 608 n.8 (2d Cir. 2006).*

As to the state law claims, the Complaint identifies Balzer as Malaney's direct supervisor and states that he provided her with a letter of recommendation on her last day of work. The letter, which Malaney submitted as part of her complaint, says only positive things about her. The Complaint does not identify Mayer or Romano, nor does it make any specific allegations concerning their participation in any alleged discrimination. Accordingly, Malaney has made no allegation that these three individuals participated in the conduct giving rise to the alleged discrimination, and has not stated an NYSHRL claim against them. *See Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004).*

Although the Second Circuit has never held squarely that the standards for evaluating individual supervisory liability under the NYCHRL are the same as those that apply under the NYSHRL, it has held that, "[t]he same standards of analysis used to evaluate aiding and abetting **[*19]** claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold, 366 F.3d at 158.* The claims against Mayer, Balzer, and Romano fail under the NYCHRL for the same reasons that they fail under the NYSHRL.

CONCLUSION

Defendants' October 31, 2007 motion to dismiss is converted into a motion for summary judgment, and the motion for summary judgment is granted.

SO ORDERED:

Dated: New York, New York

January 4, 2008

/s/ Denise Cote

DENISE COTE

United States District Judge

LEXSEE 2006 US DIST LEXIS 25308

**WILLIAM J. CARMODY, Plaintiff, - against - THE CITY OF NEW YORK; POLICE DEPARTMENT CITY OF NEW YORK; THE CIVILIAN COMPLAINT REVIEW BOARD; RAYMOND W. KELLY, Police Commissioner; JOSEPH ESPOSITO, Chief, Chief of Department; MURPHY, Lieutenant, Chief of Department; DARRYL WEIR, Sergeant, Chief of Department; RAFAEL PINEIRO, Chief, Personnel Bureau; ARNOLD S. WECHSLER, Director Employee Management Division; KEVIN KENNEY, Sergeant, Employee Management Division; CHARLES V. CAMPISI, Chief Internal Affairs Bureau; PIGNATARO, Captain, Internal Affairs Bureau Group 22; MATTHEW GRACEN, Lieutenant, Internal Affairs Bureau Group 22; MARLENE BEAMAN, Lieutenant, Internal Affairs Bureau Group 22; RIVERA, Sergeant, Internal Affairs Bureau Group 22; FLORENCE L. FINKLE, Executive Director, Civilian Complaint Review Board; VANESSA J. ROSEN, Investigator, Civilian Complaint Review Board; each defendant being sued in their individual and official capacity, Respondents.**

**05 Civ. 8084 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 25308*

**May 11, 2006, Decided**
**May 11, 2006, Filed**

**SUBSEQUENT HISTORY:** As Amended.
Summary judgment granted by *Carmody v. City of New York, 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y., Nov. 13, 2006)*

**COUNSEL:** [*1] For William J. Carmody, Plaintiff: Eric Sanders, Law Office of Jeffrey L. Goldberg, P.C., Lake Success, NY.

[*2] For The City of New York, Police Department City of New York, The Civilian Complaint Review Board, Police Com-missioner Raymond W. Kelly, individual, Police Commissioner Raymond W. Kelly, in his official capacity, Chief Jo-seph Esposito, Chief of Department, individual, Chief Joseph Esposito, Chief of Department, in his official capacity, Lieutenant Murphy, Chief of Department, individual, Lieutenant Murphy, Chief of Department, in his official capacity, Sergeant Darryl Weir, Chief of Department, individual, Sergeant Darryl Weir, Chief of Department, in his official ca-pacity, Chief Rafael Pineiro, Personnel Bureau, individual, Chief Rafael Pineiro, Personnel Bureau, in his official ca-pacity, Sergeant Kevin Kenney, Employee Management, individual, Sergeant Kevin Kenney, Employee Management, in his official capacity, Chief Charles V. Campisi, Internal Affairs Bureau, individual, Chief Charles V. Campisi, Inter-nal Affairs Bureau, in his official capacity, Captain Pignataro, Internal Affairs Bureau Group 22, individual, Captain Pignataro, Internal Affairs Bureau Group 22, in his [*2] official capacity, Lieutenant Gracen, Internal Affairs Bureau Group 22, individual, Lieutenant Gracen, Internal Affairs Bureau group 22, in his/her official capacity, Lieutenant Marlene Beaman, Internal Affairs Bureau Group 22, individual, Lieutenant Marlene Beaman, Internal Affairs Bureau Group 22, in her official capacity, Sergeant Rivera, Internal Affairs Bureau Group 22, individual, Sergeant Rivera, In-ternal Affairs Bureau Group 22, in his/her official capacity, Executive Director Florence L. Finkle, Civilian Complaint Review Board, individual, Executive Director Florence L. Finkle, Civilian Complaint Review Board, in her official ca-pacity, Investigator Vanessa J. Rosen, Civilian Complaint Review Board, individual,

Investigator Vanessa J. Rosen, Civilian Complaint Review Board, in her official capacity, Arnold S. Weschler, Defendants: Lawrence John Profeta, New York City Office of Corporation Counsel, New York, NY.

**JUDGES:** HAROLD BAER, JR., District Judge, U.S.D.J.

**OPINION BY:** HAROLD BAER, JR.

**OPINION**

### AMENDED OPINION & ORDER

#### Hon. HAROLD BAER, JR., District Judge:

Plaintiff, William Carmody, filed a complaint against the above-named seventeen defendants alleging that they engaged in several incidents of harassment, retaliation, [*3] and conspiracy against him in violation of federal and state civil rights laws while he was a police officer with the New York City Police Department ("NYPD"). [1] Defendants moved to partially dismiss the Amended Complaint pursuant to *Federal Rules of Civil Procedure Rule 12(b)(6)* for failure to state a claim upon which relief can be granted as to seven of the individually-named defendants, Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." Additionally, Defendants NYPD (sometimes "Department") and the Civilian Complaint Review Board ("CCRB") moved to dismiss the complaint on the basis that they are not suable entities under the New York City Charter. This motion was GRANTED as to these nine defendants.

> 1    Plaintiff brings his claim pursuant to the following federal and state laws: *42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, New York State Executive Law § 296, New York City Administrative Code § 8-502,* and New York State common law.

This [*4] Amended Order addresses whether the conspiracy and state law tort claims should be dismissed as to the remaining eight defendants. For the reasons stated below, this motion to dismiss with regard to these eight defendants is GRANTED in part, and DENIED in part.

## I. BACKGROUND

In a Rule 12(b)(6) motion, the allegations in the Plaintiff's Amended Complaint are taken as true. See *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).* Plaintiff recounts the following. He was hired as a NYPD officer around July 2002. Plaintiff's harassment and retaliation by the above-named defendants began when he was transferred to the 43rd Precinct in January 2003. At the 43rd Precinct, Plaintiff, a white male, was assigned to Operation Impact and partnered with Police Officer Manuel Gomez, a Hispanic officer. During their partnership, Gomez filed a discrimination lawsuit against the NYPD. As a result of this lawsuit and Plaintiff's close association with Gomez, Plaintiff alleges that certain police officers discriminated against and harassed him. Plaintiff alleges that the harassment and retaliation increased after he, along with four other officers, exposed misconduct in the 43rd Precinct and reported such misconduct to the Internal Affairs Bureau ("IAB"). Around February 5, 2004, plaintiff was notified by defendant, Florence Finkle, that certain allegations of misconduct had been found to be substantiated as against [*5] him by defendant Vanessa Rosen, CCRB Investigator.

In March 2004, Plaintiff filed an official complaint with the Department Advocate's Office, Patrolman's Benevolent Association ("PBA") as well as defendant, Finkle, with regard to defendant Rosen's actions during the misconduct investigation. Plaintiff claims that Rosen intentionally omitted crucial information that would have cleared him of all misconduct charges. On approximately December 14, 2004, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). [2] Plaintiff was terminated by the Department on February 22, 2005 for misconduct as well as residency fraud. As a result of the actions above, Plaintiff requests compensatory and punitive damages from the above-named defendants.

> 2    Plaintiff received a right-to-sue letter from the EEOC on June 22, 2005.

## II. STANDARD OF REVIEW

Pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* [*6] , the movant must establish that the plaintiff failed to "state a claim upon which relief can be granted." *FED. R. CIV. PRO. 12(b)(6).* In ruling on a Rule 12(b)(6) motion, this Court must construe all factual

allegations in the complaint in favor of the non-moving party. See*Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002)*. A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*.

## III. DISCUSSION

Plaintiff brings retaliation and hostile work environment claims against defendants pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 1981*, *New York State Executive Law § 296*, and *New York City Administrative Code § 8-502*. He brings a conspiracy claim pursuant to *42 U.S.C. §§ 1983, 1985(3)* as well as an intentional infliction of emotional distress and intentional **[*7]** interference with an employment contract claim pursuant to the New York State common law. For the most part, plaintiff's claims charge that the defendants engaged in a conspiracy to violate his constitutional rights as well as harassed and retaliated against him while he served as a NYPD officer.

### A. NYPD and CCRB

To begin with, Defense counsel contends that the NYPD and the CCRB are not suable entities in their independent capacities, thus, all claims against these parties should be dismissed. I agree.

NYPD and CCRB are agencies of the City of New York. Pursuant to the explicit terms of the New York City Charter, all actions that allege violations of law against a Department of the City must be brought in the name of the City of New York, and not the Department. See *NEW YORK CITY CHARTER § 396* ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); See also *Montes v. King, 2002 U.S. Dist. LEXIS 4412, 2002 WL 424318, *5 (S.D.N.Y. Mar. 19, 2002)* (providing that the New York City Police Department is not a suable entity). **[*8]** Consequently, all claims against the NYPD and the CCRB are dismissed.

### B. Individually Named Defendants

Joseph Esposito, "Murphy", Rafael Pineiro, Charles

V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" move to dismiss the claims filed against them based on the failure of the plaintiff to allege any personal involvement in the alleged misconduct. [3] Since this is my reading of the complaint as well, the motion to dismiss is granted. An analysis as to these claims follows.

> 3    Defendant does not challenge the sufficiency of the plaintiff's claims in this matter and, correspondingly, this Court does not rule on that basis.

### 1. Title VII Claims Against the Seven Movants

This section will discuss the retaliation and hostile work environment claims plaintiff alleges under Title VII of the Civil Rights Act of 1964. Plaintiff also alleges retaliation and hostile work environment pursuant to the Civil Rights Act of 1866, *42 U.S.C. § 1981*. The *§ 1981* claim is discussed **[*9]** in Part Two below.

### A. Retaliation

Plaintiff contends that defendants retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e-3*. [4] To establish a claim here, the plaintiff must allege the prongs necessary to prove a prima facie case. They include: 1) that plaintiff engaged in a protected activity known to the defendant, 2) suffered an adverse employment action, and 3) there exists a causal connection between the protected activity and the adverse employment action. See*Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)*. Here, the Amended Complaint clearly alleges the second element, namely, that he suffered an adverse employment action. See*Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)* (providing that an adverse employment action may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). Plaintiff was discharged in February 2005.

> 4    This section makes it illegal for an employer to discriminate against an employee based on participation in any Title VII enforcement or investigation action.

**[*10]** However, Plaintiff failed to sufficiently plead the first and third elements required to establish a retaliation claim. Plaintiff states that he filed an official complaint with the PBA in March 2004 as well as an EEOC complaint in November 2004. Amended

Complaint P37, P47. Both complaints qualify as protected activities under Title VII. See, e.g., *Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001)*. However, Plaintiff failed to allege that any of the seven defendants knew of either the EEOC complaint or the internal complaint filed with PBA, as required to meet the first element.

Further, the Plaintiff fails to satisfy the third element. Although Plaintiff was fired a couple of months after he filed the EEOC complaint, as mentioned previously, it is not alleged that any of the defendants knew about either complaint. Without this knowledge, the requisite causal connection between the adverse employment action and the protected activity is not made out and the claim must fail.

The motion to dismiss the Title VII retaliation claim is granted as to all seven individual defendants.

*B. Hostile Environment Claim*

To state a claim under Title VII for hostile [*11] work environment, the Plaintiff must allege that their work environment was "abusive." *Harris v. Forklift, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. A work environment is abusive when harassment has reached a level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)* (internal quotation marks omitted). This Court looks at the totality of the circumstances to determine harassment. This includes "the quantity, frequency, and severity of the incidents." *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999)* (internal quotation marks and citations omitted). To succeed, the Plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (internal quotation marks omitted).

The Plaintiff does not allege any instances of abusive behavior or harassment [*12] against the seven individually named defendants. Put another way, there is nothing in the Complaint to suggest that any of the defendants contributed to the hostile work environment Plaintiff contends he endured while employed with the NYPD.

The motion to dismiss this claim too is granted as to all defendants.

*2. § 1981 and § 1983*

*Section 1981* forbids discrimination with regard to the conditions of a contractual relationship while *§ 1983* allows individuals to sue others who violate their constitutional rights. To state a claim against an individual pursuant to *42 U.S.C. § 1981* and *§ 1983*, a plaintiff must set forth facts that establish the personal involvement of the individual in the alleged deprivation of civil rights. See, e.g., *Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 127 (2d Cir. 2004)* (dismissing *§ 1983* claim against defendant where there was no allegation or material fact that demonstrated that he directly engaged in any discriminatory conduct); *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000)* (dismissing *§ 1981* claim against [*13] individual for failure to demonstrate personal involvement by the defendant). Personal involvement can be demonstrated in any of the following ways: 1) defendant directly participated in the alleged wrongdoing, 2) defendant failed to remedy the wrong after being informed via a report or appeal, 3) defendant created a policy or custom under which unconstitutional acts occurred, or allowed the continuance of such policy, 4) defendant was grossly negligent in supervising subordinates who committed the illegal acts, or 5) defendant exhibited deliberate indifference by failing to act on information indicating unconstitutional acts were occurring. *Back, 365 F.3d at 127*. Merely holding a position of authority or supervision is not enough. See, e.g., *Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)*.

With the exception of broad, conclusory allegations stated in the plaintiff's enumerated claims, no factual allegations of wrongdoing are asserted against six of the defendants -- Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." See Amended Complaint PP79 et seq. Further, nowhere in the Amended Complaint does [*14] the Plaintiff allege that any of these six defendants participated, either directly or in their supervisory capacity, in the alleged illegal acts. [5] Without this, the motion to dismiss the *§ 1981* and *§ 1983* claims must, and hereby are, granted as to these individuals.

> 5    Plaintiff's reply brief argues that these defendants were personally involved in the alleged illegal acts, primarily in their supervisory

capacities. However, the citations to the Amended Complaint do not discuss any wrongful acts by the defendants, nor even mention any of the defendants by name.

With regard to defendant Rafael Pineiro, identified in the Amended Complaint as Chief of the Personnel Bureau, Plaintiff alleges that he submitted a memorandum to Pineiro outlining the retaliatory actions by officials at NYPD. Amended Complaint P48. Although not plead, Pineiro presumably did nothing upon receipt of the memorandum from plaintiff. This fact, if true, may have been helpful, but even if alleged, and it was not, courts have concluded [*15] that merely sending a letter to a supervisory official does not rise to the level of personal liability. See, e.g., *Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y. 1989)* (finding that defendant's failure to respond to plaintiff's letter of protest or to request an investigation of the plaintiff's allegations was insufficient to establish liability). While clearly this inaction does not posit personal liability for Chief Pineiro, it should not be confused with being a badge of honor either. A system whereby letters, especially letters from members of the force, are answered and answered promptly is obviously to be preferred.

Further, there is no allegation that Pineiro was either grossly negligent or exhibited deliberate indifference in his purported decision not to follow-up on plaintiff's memorandum. See*Gant ex rel. v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999)* ("Deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'"). Plaintiff does not even allege whether or not there was a duty for Pineiro to investigate. In fact, it appears [*16] there was a formal grievance procedure via the PBA by which to adjudicate Plaintiff's grievance and it was never utilized. Without more, I find that Plaintiff's *§§ 1981* and *1983* claims against Pineiro must fail.

### 3. Conspiracy Claims

Plaintiff also contends that the defendants conspired to violate his constitutional rights pursuant to *§§ 1983* and *1985(3)*. In order to survive a motion to dismiss on a *§ 1983* conspiracy claim, the plaintiff must allege 1) an agreement between two or more state actors, 2) concerted acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal. See, e. g., *Ciambriello v.*

*County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002)*. A complaint that includes vague allegations and fails to include specific instances of misconduct will not withstand a motion to dismiss. See, e.g., Id. Specifically, plaintiff must provide a factual basis that supports an allegation that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end." *Romer v. Morgenthau, 119 F. Supp. 2d 346, 363* (internal quotations and citations omitted). The same standard applies under both [*17] sections. See *Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)* (stating that a conspiracy claim under *§ 1983* "should actually be stated as a claim under *Section 1985*, which applies specifically to conspiracies.") [6]

> [6]  To state a claim under *42 U.S.C. § 1985(3)*, a plaintiff must plead: 1) a conspiracy, 2) for the purpose of depriving, either directly or indirectly, any person of equal protection of the law, 3) an act in furtherance of the conspiracy, 4) injury. See*Straker v. Metro. Transit Auth., 333 F. Supp. 2d 91, 98 (E.D.N.Y. 2004)*.

The plaintiff fails to allege the prerequisites needed to sustain a conspiracy claim against any of the individual defendants. As mentioned above, plaintiff fails to allege any agreement in the Amended Complaint between six of the seven defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria"). With regard to Pineiro, paragraph 48 of the Complaint fails to allege facts that would suggest that Pineiro conspired with anyone to violate the plaintiff's constitutional rights. The extent of the allegation against Pineiro is that he received from Plaintiff a memorandum that outlined the harassment [*18] and retaliatory activity of the other named defendants toward the Plaintiff. There is no allegation to even suggest an agreement by Pineiro with one or more of the individual defendants, or for that matter anyone else, to violate *§ 1983* or *§ 1985(3)*. Thus, the motion to dismiss is granted with respect to the conspiracy claims brought against all seven defendants.

### 4. State Law Claims

Since I have granted the motion to dismiss as to the federal claims over which I had original jurisdiction, I decline to exercise pendent jurisdiction over the state law claims with regard to seven of the individually named defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria") as well as the NYPD and CCRB. See *28 U.S.C. § 1367(c)(3)*

. As such, the state law claims against all of these entities are dismissed.

### C. Remaining Defendants

The, remaining eight defendants, City of New York, Darryl Weir, Arnold S. Wechsler, Kevin Kenney, Marlene Beaman, Raymond W. Kelly, Florence L. Finkle, and Vanessa J. Rosen move to dismiss the conspiracy claims brought pursuant to §§ 1983 and 1985(3) as well as the state law tort claims against them. The motion is granted in part, and denied in part.

#### 1. Conspiracy Claims

As stated above, the plaintiff must allege 1) an agreement between two or more state actors, 2) concerted acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal to survive a motion to dismiss a § 1983 conspiracy claim. See, e.g., Ciambriello, 292 F.3d at 324-25. [7] Even assuming plaintiff sufficiently alleged agreement between these defendants, it is doubtful whether the Plaintiff satisfied the second element and demonstrated that the defendants acted with the purpose to inflict an unconstitutional injury. The U.S. Supreme Court has stated that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" to give rise to § 1985(3) liability. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971). Plaintiff is a white male. He does not allege that the discrimination he allegedly suffered was motivated by his membership in a protected class. Instead, he appears to base his alleged injury on his police partner's membership in a protected class. His partner is Hispanic.

> [7]  As mentioned previously, the same standard applies for a conspiracy claim brought pursuant to § 1985(3).

Even if the Amended Complaint is read to suggest that this is enough, it appears that the conspiracy claims against the remaining defendants is also barred due to the intra-enterprise conspiracy doctrine, also known as the intra-corporate conspiracy doctrine. The doctrine states that individuals of a single entity that act within the scope of their employment cannot conspire with each other. The doctrine originated in the corporate context, but has been applied most recently to public entities. See, e.g. Straker v. Metro. Transit Auth., 2005 U.S. Dist. LEXIS 30956, at

8-10 (E.D.N.Y. Dec. 5, 2005) (applying intra-corporate conspiracy doctrine to alleged conspiracy perpetrated by New York City Transit Authority); Salgado v. City of New York, 2001 U.S. Dist. LEXIS 3196, 2001 WL 290051, at 9 (S.D.N.Y. Mar. 26, 2001) (finding that § 1985(3) claim is barred under the intra-enterprise conspiracy doctrine because all defendants are agents of the City of New York). Since all defendants are employees or agents of the City of New York, I find that the intra-enterprise conspiracy doctrine also bars this claim. [8]

> [8]  Plaintiff has not alleged, nor argued, that any of the defendants had an independent, personal motive for their behavior towards the plaintiff, thus, I do not decide whether the "personal interest" exception to this doctrine applies.

For the above reasons, the motion to dismiss is granted with respect to the conspiracy claims brought against these defendants as well.

#### 2. State Law Tort Claims

These eight defendants argue that the state common law claims of intentional infliction of emotional distress and intentional interference with an employment contract are barred against them because the plaintiff failed to file a notice of claim as required by New York General Municipal Law. I disagree.

It is undisputed that the plaintiff failed to file a notice of claim in this case. [9] But, I do not think that is required under New York State law when an action is brought against employees of public corporations. New York General Municipal Law provides that:

> Service of the notice of claim upon an officer, appointee or employee of a public corporation *shall not be* a condition precedent to the commencement of an action or special proceeding against such person.

N.Y. GEN. MUN. § 50e-(1)(b)(emphasis added). Defense counsel does not argue that this provision is inapplicable to the remaining defendants. As such, the motion to dismiss both the intentional infliction of emotional distress and intentional interference with an employment contract claims are denied with regard to the remaining defendants.

9  Plaintiff does not allege that he did so either in his Amended Complaint or in the motion papers submitted to this Court.

## IV. CONCLUSION

For the reasons above, this motion to dismiss all claims was granted with prejudice as to individual defendants Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" on the grounds of lack of personal involvement. The motion to dismiss was granted without prejudice as to the NYPD and the CCRB. This Opinion is amended to dismiss the conspiracy claim, with prejudice, as to the remaining eight defendants, but the motion to dismiss the state law tort claims, as to these defendants, is denied.

**IT IS SO ORDERED.**

New York, New York

May 11, 2006

 **[*19]**  Harold Baer, Jr.

U.S.D.J.

LEXSEE 2007 US DIST LEXIS 116



Positive
As of: Jul 17, 2008

**NANCY RUHLING, Plaintiff, -against- TRIBUNE COMPANY, et al., Defendants.**

**CV 04-2430 (ARL)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 116*

**January 3, 2007, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Motion for new trial denied by *Ruhling v. Newsday, Inc., 2008 U.S. Dist. LEXIS 38936 (E.D.N.Y., May 13, 2008)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee claimed she was discriminated against on the basis of her age and gender in violation of the Age Discrimination in Employment Act of 1967 (ADEA), *29 U.S.C.S. § 631 et seq.*, Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the New York State Human Rights Law (NYSHRL), *N.Y. Exec. Law § 296* (2005). Defendants, a former employer and its parent company, moved for summary judgment.

**OVERVIEW:** The parties consented to the undersigned exercising plenary jurisdiction over this action. As there was no basis to find that defendants were a single employer, the claims against the parent company were dismissed. There were issues of fact regarding the reasons for the employer's actions, including the employee's suspension and job transfer, and based on those facts, the employee might have been able to persuade a jury that the employer discriminated against her based on age. However, the employee failed to present any evidence giving rise to an inference of gender discrimination. The employee acknowledged that the employer did not perceive her to be disabled within the meaning of the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C.S. § 12101 et seq.* Because the employee was not disabled for purposes of the ADA, her claims under the

statute were dismissed. However, the employee's disability claims under the NYSHRL survived dismissal as the employee satisfied her burden on the pretext requirement. The employee's hostile work environment claims pursuant to the NYSHRL and the ADEA survived dismissal as did her constructive discharge claim.

**OUTCOME:** The magistrate granted defendants' motion for summary judgment in part and denied it in part. Inter alia, the age discrimination, state disability, hostile work environment pursuant to the NYSHRL and the ADEA, and constructive discharge claims survived dismissal but the gender discrimination, federal disability claims failed. The state negligence and intentional infliction of emotional harm claims failed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law. In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. The applicable substantive law determines which facts are critical and which are irrelevant.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN2] The trial court's responsibility is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution. When, however, there is nothing more than a metaphysical doubt as to the material facts, summary judgment is proper. Rather, there must exist specific facts showing that there is a genuine issue for trial in order to deny summary judgment as to a particular claim. A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN3] The summary judgment standard applies with equal force to discrimination cases as it does to other cases. The salutary purposes of summary judgment-- avoiding protracted, expensive and harassing trials-- apply no less to discrimination cases than to commercial or other areas of litigation. Thus, though caution must be exercised in granting summary judgment where motive is genuinely in issue it remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > Distinct & Separate Principle*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
[HN4] The United States Court of Appeals for the Second Circuit has made clear that the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances. In determining whether such circumstances are present, courts apply a flexible, four-part test that examines whether the related entities have: (1) interrelated operations; (2) common management; (3) centralized control of labor relations, and (4) common ownership. Satisfaction of all four factors is not required, nor is any one factor deter-

minative. Rather, the critical question is what entity made the final decisions regarding employment matters related to the person claiming discrimination.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > Distinct & Separate Principle*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
[HN5] In determining whether there is a sufficient interrelation of operation between the related entities, courts have considered factors such as whether the parent was involved directly in the subsidiary's daily business decisions; whether the two entities shared employees, services, records, or equipment; and whether the entities commingled assets or finances. In addition, the requisite degree of control over labor relations has been established when the parent reviewed applications for employment at the subsidiary, approved personnel status reports, and approved all major employment decisions for the subsidiary. The remaining factors, the degrees of common management and common ownership, are considered less important, owing to the fact that they represent ordinary aspects of the parent-subsidiary relationship.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*
[HN6] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits an employer from discriminating against an individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin. *42 U.S.C.S. § 2000e-2(a)(1).*

*Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions > General Overview*
[HN7] The Age Discrimination in Employment Act of 1967, *29 U.S.C.S. § 631 et seq.*, which protects individuals over age forty from employment discrimination on account of their age, provides that it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. *29 U.S.C.S. § 623(a)(1).*

*Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions > General Overview*

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
[HN8] The New York State Human Rights Law, *N.Y. Exec. Law § 296* (2005) prohibits discrimination against an employee in the terms, conditions or privileges of employment because of the individual's sex and age. *N.Y. Exec. Law § 296(1)(a)* (2005).

*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Burden Shifting*
[HN9] To establish a prima facie case of gender or age discrimination, a plaintiff must demonstrate: she is a member of a protected group; she was qualified for the position; she suffered an adverse employment action; and the circumstances surrounding the action permit an inference of discrimination. Although the burden of proving the prima facie case is de minimus, the claim fails if the plaintiff cannot make out a prima facie case. Once the plaintiff establishes the prima facie case, the burden of proof shifts to the defendant to offer a non-discriminatory reason for the employment action. Once this reason is established, the presumption of discrimination arising with the establishment of the prima facie case drops. Thereafter, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination. This final burden of showing pretext may be satisfied by the introduction of additional evidence or by reliance on the evidence submitted in support of the prima facie case of discrimination. The court must examine the entire record to determine whether the plaintiff could satisfy the ultimate burden of persuading the trier of fact the defendant intentionally discriminated against the plaintiff.

*Labor & Employment Law > Discrimination > Age Discrimination > Statutes of Limitations*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN10] Under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the Age Discrimination in Employment Act of 1967, *29 U.S.C.S. § 631 et seq.*, a plaintiff must file an administrative charge with the Equal Employment Opportunity Commission (EEOC) within 300 days after a claim accrues. This 300-day requirement functions as a statute of limitations, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > Continuing Violations*
[HN11] While the continuing violations doctrine may extend the limitations period for claims of discriminatory acts committed under an ongoing policy of discrimination, it is limited in application and does not preserve untimely claims related to discrete, completed employment actions such as transfers. Notwithstanding the continuing violations doctrine, because a discrete discriminatory act occurs on the day that it happened, a party must file her charge within 300 days of the act or lose the ability to recover for it.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN12] Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. Thus, the defendant need not persuade the court that it was actually motivated by the proffered reasons in order to nullify the presumption and obligate the plaintiff to satisfy the burden. If the defendant articulates a non-discriminatory reason, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof*
[HN13] To satisfy the burden of showing that the reasons articulated by a defendant were a pretext for age discrimination, a plaintiff need not come forward with evidence in addition to that presented in support of her prima facie case. Instead, she may rely on her prima facie case combined with sufficient evidence to find that the employer's asserted justification is false.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Reassignments & Transfers*
[HN14] A schedule change standing alone does not constitute an adverse employment action.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
[HN15] The law is clear that a nonmoving party must present more than mere speculation and conjecture to defeat summary judgment.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > General Overview*
[HN16] Because liability depends upon whether a plaintiff's gender actually motivated a defendant's decision, there simply can be no liability where there is a paucity of evidence that the plaintiff's gender actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*
[HN17] The Americans with Disabilities Act of 1990, *42 U.S.C.S. § 12101 et seq.*, and the New York State Human Rights Law, *N.Y. Exec. Law § 296* (2005), prohibit discrimination against persons with disabilities in the terms, conditions and privileges of employment. *42 U.S.C.S. § 12112(a); N.Y. Exec. Law § 296(1)(a)* (2005).

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*
[HN18] Under the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C.S. § 12101 et seq.*, a prima facie case of disability discrimination requires that the plaintiff show that: (1) the defendants are subject to the ADA; (2) the plaintiff has a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action as a result of her disability.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*
[HN19] To establish a disability within the meaning of the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C.S. § 12101 et seq.*, the plaintiff must establish either that (1) she suffers from a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *42 U.S.C.S. § 12102(2)*. Irrespective of whether a plaintiff's claim is based on actual, recorded or perceived disability, the disability must be an impairment covered by the ADA, that is, the disability is one that substantially limits a major life activity.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Impairments > Major Life Activities*
[HN20] To be substantially limited in performing manual tasks, an individual must have a impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term. The United States Supreme Court explained that because there are large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the Americans with Disabilities Act of 1990, *42 U.S.C.S. § 12101 et seq.* Similarly, courts in the Second Circuit that have examined this issue and found that by and large carpal tunnel syndrome or similar limitations on repetitive motion do not substantially limit a major life activity.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > Regarded With Impairment*
[HN21] Under the third method of establishing a disability under the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C.S. § 12101 et seq.*, a plaintiff must show that she is regarded as having an impairment that substantially limits one or more major life activities. *42 U.S.C.S. § 12102(2)(C)*. Whether an individual is regarded as having a disability turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability. While the decisive issue is the employer's perception of his or her employee's alleged impairment, the plaintiff must show that the employer regarded her as disabled within the meaning of the ADA.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > Disabilities > General Overview*
[HN22] While disability claims under the Americans with Disabilities Act of 1990 (ADA), *42 U.S.C.S. § 12101 et seq.*, and the New York State Human Rights Law (NYSHRL), *N.Y. Exec. Law § 296* (2005), are subject to the same analytical framework, the NYSHRL has a more expansive definition of "disability" and does not

require a plaintiff to identify a major life activity that is substantially limited by the alleged impairment.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview***
***Labor & Employment Law > Discrimination > Disability Discrimination > Reasonable Accommodation > General Overview***
[HN23] The New York State Human Rights Law (NYSHRL), *N.Y. Exec. Law § 296 (2005)*, prohibits an employer from discriminating against a disabled employee in terms, conditions or privileges of employment and the failure to provide a reasonable accommodation is a form of discrimination under the statute. *N.Y. Exec. Law § 296(1)(a), (3)(a)* A failure to accommodate claim requires a plaintiff to allege facts showing that: (1) she has a disability; (2) with or without reasonable accommodation she was qualified to perform the essential functions of the job; (3) the employer discriminated against her because of her disability. A disability discrimination claim alleging a failure to accommodate under the New York State Human Rights Law is governed by the same legal standards as govern federal Americans with Disabilities Act of 1990, *42 U.S.C.S. § 12101 et seq.*, claims.

***Labor & Employment Law > Discrimination > Disability Discrimination > Reasonable Accommodation > Interactive Process***
[HN24] The New York State Human Rights Law (NYSHRL), *N.Y. Exec. Law § 296 (2005)* envisions that an employer and a disabled employee will work together to find a satisfactory accommodation. N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(j) and (k); Ultimately, the choice as to which of several reasonable accommodations will be implemented is left to the sound discretion of the employer.

***Labor & Employment Law > Discrimination > Disability Discrimination > Reasonable Accommodation > Interactive Process***
[HN25] See *29 C.F.R. § 1630.9*.

***Labor & Employment Law > Discrimination > Harassment > General Overview***
[HN26] A plaintiff establishes a hostile work environment claim by showing that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. In assessing the overall hostility of a workplace, charges of discrimination must be considered cumulatively in order to obtain a realistic view of the work environment. The incidents comprising a hostile work environment need not make any reference to the trait or condition on the basis of which the discrimination has occurred, so long as the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.

***Labor & Employment Law > Discrimination > Harassment > General Overview***
[HN27] Hostile work environment claims brought under the Age Discrimination in Employment Act of 1967, *29 U.S.C.S. § 631 et seq.*, and the New York State Human Rights Law, *N.Y. Exec. Law § 296 (2005)*, are analyzed under the same standards. A plaintiff who brings a hostile work environment claim must prove that: (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. Although there is no threshold magic number of harassing incidents that gives rise, without more, to liability, the plaintiff must demonstrate either that a single incident was extraordinarily severe or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. The U.S. Court of Appeals for the Second Circuit has instructed that the appalling conduct alleged in prior cases should not mark the boundary of what is actionable. Rather, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.

***Labor & Employment Law > Discrimination > Harassment > General Overview***
[HN28] Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. Because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, a hostile work environment claim will be timely so long as one act contributing to claim occurred within the statutory period; if it did, the entire time period of the hostile environment may be considered by a court for purposes of determining liability.

***Labor & Employment Law > Discrimination > Disparate Treatment > Defenses & Exceptions > General Overview***

[HN29] The Faragher/Ellerth affirmative defense is unavailable where the actions complained of emanate from the employer through its supervisory personnel.

*Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview*
[HN30] Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. According to the United States Court of Appeals for the Second Circuit, working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. A prima facie case of constructive discharge requires that the plaintiff establish that the alleged constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class.

*Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview*
[HN31] A constructive discharge claim can be premised on the cumulative affect of a number of adverse conditions in the workplace.

*Labor & Employment Law > Discrimination > Disparate Treatment > Defenses & Exceptions > General Overview*
[HN32] Where an employee quits in reasonable response to employer-sanctioned adverse action officially changing her employment status or situation the Faragher/Ellerth affirmative defense is unavailable.

*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Age Discrimination in Employment Act*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Americans With Disabilities Act*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN33] *42 U.S.C.S. § 2000e-3(a); 29 U.S.C.S. § 623(d); 42 U.S.C.S. § 12203(a); N.Y. Exec. Law § 296(1)(e)* prohibit retaliation against any employee who makes a complaint against her employer regarding any practice made unlawful by these statutes. These statutes contain similar provisions against retaliation and are governed by the same standards.

*Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof*
*Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview*
[HN34] Claims of retaliation are analyzed using the McDonnell Douglas burden-shifting framework discussed above. Under that framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation by showing: (1) that the plaintiff engaged in a protected activity; (2) that the employer was aware of this activity; (3) that the employer took an adverse action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. A plaintiff's burden at this prima facie stage is de minimis. Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. If the defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Americans With Disabilities Act*
[HN35] An individual engages in "protected activity" under the Americans with Disabilities Act of 1990, *42 U.S.C.S. § 12101 et seq.*, if he has opposed any practice made unlawful by this section or has participated in any manner in an investigation, proceeding, or litigation under this chapter. Interpreting this language, the United States Court of Appeals for the Second Circuit has explained that, as this choice of language clearly indicates, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint. A retaliation claim may in some instances be established even where there has been no Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibited discrimination, i.e., where the plaintiff shows, inter alia, that she had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the employer could reasonably have understood that Title VII-prohibited discrimination was the subject of her protest.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
[HN36] The declination of a buyout is not protected activity under the law and cannot serve as the basis of a retaliation claim.

2007 U.S. Dist. LEXIS 116, *

*Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link*

[HN37] A plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment. Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination. A job reassignment may satisfy the adverse action requirement in a retaliation claim. Folded into the analysis of what constitutes an actionable adverse action is the requirement that there be a causal connection between the adverse action and the protected activity.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link*

[HN38] In evaluating whether a causal connection exists between the adverse action and the protected activity, courts have considered their temporal proximity. The cases uniformly hold that the temporal proximity must be very close. While the United States Court of Appeals for the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action, district courts in the Second Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.

*Workers' Compensation & SSDI > Defenses > Exclusivity Provisions*

[HN39] The New York Workers' Compensation Law exclusive remedy doctrine bars an employee from bringing a negligence or gross negligence based claim against an employer.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN40] Under New York law, the elements of a claim for intentional infliction of emotional harm (IIED) are: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. While IIED does not proscribe specific conduct, the New York Court of Appeals has required that a plaintiff allege conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community. New York sets a high threshold for conduct that is considered 'extreme and outrageous' enough to constitute intentional infliction of emotional distress, and intentional infliction of emotional distress is an extremely disfavored cause of action. Clearly, the allegations in the instant complaint fail to meet this high threshold and as such her claim is subject to dismissal on this basis alone. Additionally, however, the absence of adequate proof of severe emotional distress warrants dismissal of this claim. A plaintiff's claim of severe emotional distress must be supported by medical evidence, not just the mere recitation of speculative claims.

COUNSEL:  [*1]  For Nancy Ruhling, Plaintiff: Louis D. Stober, Jr., LEAD ATTORNEY, Law Offices of Louis D. Stober, Jr., Garden City, NY.

For Tribune Company, Newsday Inc. their subsidiaries, agents and assigns, Defendants: Edward Cerasia, II, Yvette M. Gordon, Proskauer Rose LLP, Newark, NJ.

JUDGES: ARLENE R. LINDSAY, United States Magistrate Judge.

OPINION BY: ARLENE R. LINDSAY

OPINION

OPINION AND ORDER

LINDSAY, Magistrate Judge:

Before the court is a motion for summary judgment by the defendants Tribune Company and Newsday, Inc., (together, "Defendants") pursuant to *Fed. R. Civ. P. 56.* The parties have consented to the undersigned exercising plenary jurisdiction over this action pursuant to *28 U.S.C. § 636(c).* For the reasons set forth below, the defendants' motion for summary judgment is granted in part and denied in part.

I. FACTS

A. Employment History

Plaintiff, who was born in 1956, began her employment with Newsday (a subsidiary of the Tribune Company) in 1984 as an Assistant Editor in its Melville, New York office. (Def. R. 56.1 Statement at PP 3-4; Suppl. Compl. at P 5; Pl. R. 56.1 Statement at PP 2-3). [1] According [*2] to the plaintiff, shortly after commencing her employment with Newsday in 1984, she was sexually harassed by a supervisor and she immediately reported that harassment internally to Newsday. (Suppl. Compl. at PP 17-18). Plaintiff continued to work as an Assistant

2007 U.S. Dist. LEXIS 116, *

Editor until she resigned on May 9, 2005. (Id. at PP 12-13). Between 1984 and March 17, 2002, the plaintiff was assigned to work on Newsday's Night News Desk. (Def. R. 56.1 Statement at P 22; Suppl. Compl. at P 12). During that time, her assigned work schedule was Saturday through Wednesday from 4:30 p.m. to 12:00 a.m. (Def. R. 56.1 Statement at P 22). In addition to her work as an Assistant Editor, plaintiff often wrote articles on a freelance basis for publication in Newsday. (Id. at P 15).

1   The facts set forth in the defendants' *Rule 56.1* Statement that are cited to by the court have been admitted by the plaintiff.

### B. The "Buyout"

In January 2002, Newsday offered its senior employees a voluntary early retirement program, referred to as a [*3] "buyout." (Id. at P 17). The buyout, which expired February 28, 2002, was offered to the plaintiff. (Suppl. Compl. at P 25). Plaintiff elected not to take the buyout choosing instead to continue her employment at Newsday. (Def. R. 56.1 Statement at P 18). Her problems at Newsday began shortly after she made that choice.

Immediately following the expiration of the buyout, plaintiff was notified that she was to be transferred to the Features Desk and that her work schedule would be changed. (Id. at P 23). The Features section of the newspaper is dedicated to reporting on lifestyles, arts and entertainment. (Id. at P 20). Plaintiff objected to the transfer both because she considered features to be a less prestigious assignment and because she would be required to work a "daytime" schedule of Sundays from 9:30 a.m. to 4:00 p.m. and Monday through Thursday from 12:30 p.m. to 8:00 p.m. (Id. at P29). She was nonetheless assigned to the Features Desk until May 2005 and reported to Jack Millrod, Newsday's Executive News Editor. (Id. at P 23).

In May 2002, plaintiff was contacted by Stephanie Abrutyn, Senior Counsel at the Tribune, regarding one of plaintiff's freelance [*4] articles that had been published in Newsday. (Id. at P 42). The article had been posted on an outside website without Newsday's permission. (Id. at P 43). Abrutyn sent a letter to the website owner demanding that they stop posting plaintiff's article as it was the intellectual property of Newsday. (Id. at P 44). Abrutyn was informed that the website had received plaintiff's permission to post the article. (Id.). Abrutyn then contacted plaintiff advising her that Newsday owned the copyright to articles published in Newsday and that plaintiff could not grant a third-party permission to publish those articles notwithstanding her authorship. (Id. at P 45). Plaintiff, who had been submitting freelance articles to Newsday for years, informed Abrutyn

that this represented a change in Newsday's policy and that previously she had been permitted to authorize the publication of her own articles as long as Newsday was credited as the original publisher. (Id. at P 45; Pl. R. 56.1 Statement at P37). Abrutyn informed plaintiff that Newsday would no longer accept her freelance articles unless she signed an agreement acknowledging Newsday's sole ownership rights. (Def. R. 56.1 [*5] Statement at PP 47, 50). Plaintiff asserts that she alone was required to sign such an agreement. (Pl. R. 56.1 Statement at P40). Although she signed the agreement, she stopped submitting freelance articles to Newsday. (Def. R. 56.1 Statement at P 50).

### C. Plaintiff's Repetitive Stress Injury

In December 2002, plaintiff's schedule was again changed. (Id. at P 32). Her schedule was moved from Sunday to Thursday to Monday through Friday. (Id.). Plaintiff claims that Millrod chose to change plaintiff's schedule over a male colleague as a reward for the latter's "personal loyalty" and participation in the company's co-ed softball team. (Pl. R. 56.1 Statement at PP 28, 31). Plaintiff complained to Tony Marro, then-Newsday's Editor, about the schedule change charging that Millrod showed "favoritism" to persons loyal to him. (Def. R. 56.1 Statement at P 36). Coincidentally, at this same time, plaintiff claimed to have suffered a recurrence of a repetitive stress injury (RSI), a condition she alleged resulted from her employment with Newsday. (Id. at P 67). According to plaintiff, her RSI generated pain in her arms and shoulders making tasks such as carrying a briefcase, typing [*6] on a keyboard and sleeping on the affected side of her body more difficult. (Ruhling Dep. at 149-51). In December, 2002 and January 2003, explaining that her RSI prevented her from doing the keystrokes, plaintiff did not comply with several requests that she edit articles. (Def. R. 56.1 Statement at P 69; Pl. R. 56.1 Statement at P 54). Notwithstanding this explanation, plaintiff was issued a written reprimand for failing to complete these tasks. (Def. R. 56.1 Statement at P 70). On January 30, 2003, after being reprimanded, plaintiff sought treatment for her RSI. (Id. at P 73). Her doctor cleared her to continue working, but recommended that she take regular work breaks and undergo a course of physical therapy two times per week for four weeks. (Id. at P 73, Ruhling Dep. Ex. 7).

In February 2003, Ruhling asked Newsday to temporarily change her work schedule back to include Sundays so that she could have a weekday off to go for physical therapy. (Def. R. 56.1 Statement at P 74). As an option, plaintiff proposed that she be permitted to report to work one-hour later two days per week for one month so she could seek therapy before work. Newsday declined her request and instead [*7] offered plaintiff the

opportunity to apply for leave under the Family and Medical Leave Act ("FMLA"). (Id. at PP 75- 76). Alternatively, plaintiff was told she could work a split-shift, which would allow her to leave work mid-shift to attend physical therapy. (Id. at P 75). Plaintiff refused the FMLA option surmising that the leave was unpaid and also rejected the split-shift option because it involved added travel back and forth to work. (Id. at P 80; Pl. R. 56.1 Statement at 62; Ruhling Dep. at 132). In April 2005, plaintiff provided Newsday with documentation from her physician indicating that she should limit her use of the computer keyboard and mouse to a maximum of four hours per day. (Def. R. 56.1 Statement at P 81). Newsday permitted her to reduce her computer work accordingly. (Id.).

On January 27, 2003, following an anti-harassment training session, the plaintiff sent Newsday's then-CEO, John Madigan, a memo indicating that pursuant to this training she felt compelled to disclose information which she believed was the "honorable thing to do" and which "reflect[ed] upon the image of corporate headquarters." (Defs. 56.1 Statement at PP 54, 56; Ruhling Dep. [*8] Ex. 32). In response to that memo, the plaintiff was contacted by telephone on February 4, 2003 by Katie Lawler, then-Vice President of Human Resources for Tribune Publishing, who explained that the plaintiff's concerns had been referred to Lawler for investigation. (Defs. 56.1 Statement at PP 58-59). Ruhling refused to discuss her complaint with Lawler insisting instead that she speak with the company CEO. (Id. at P 62). Although plaintiff was informed that she must first provide Lawler the specifics of her complaint before a decision would be made on her request to speak with the CEO, she steadfastly refused to discuss the matter with Lawler. (Id. at PP 62, 65; Ruhling Dep. at 335-36, 342-51). According to the plaintiff, she did not discuss her complaint with Lawler because she was concerned that she would be subject to further retaliation and harassment. (Pl. R, 56.1 Statement at P 51). Lawler contacted the plaintiff again on April 9, 2003. (Def. R. 56.1 Statement at P 62). Plaintiff persisted in her demand that they speak directly with Newsdays' CEO, not Lawler. (Id.).

D. Plaintiff's Suspensions and Subsequent Resignation

Apparently, not unlike other Newsday employees, [*9] plaintiff maintained a personal cell phone while at work. (Pl. R. 56.1 Statement at P 65). According to Millrod, plaintiff's cell phone was particularly disruptive to her co-employees and he instructed her to silence it at work. (Def. 56.1 Statement at PP 83-86). On February 5, 2003, when plaintiff did not comply, Millrod formally reprimanded her and suspended her for one day without pay for insubordination. (Id. at P 87). Plaintiff objected to the suspension both because she was singled out for

disciplinary action and because she claims to have complied with Millrod's direction which she believed was simply that she keep her cell phone on her person while at work. (Pl. R. 56.1 Statement at P 69). Coincidentally, this suspension occurred the day after plaintiff's first conversation with Lawler.

On April 29, 2003 plaintiff was suspended for a second time without pay for taking a personal day off without prior approval from her supervisor. (Def. R. 56.1 Statement at P 90). According to plaintiff, during her nearly twenty-year tenure at Newsday, she had never been required to obtain supervisory approval prior to taking a personal day. (Pl. R. 56.1 Statement at P 70). This second [*10] suspension took place twenty days after plaintiff's second conversation with Lawler. (Def. R. 56.1 Statement at P 62).

In January 2005, Debby Krenek became the Managing Editor in charge of the News Desks at Newsday. (Id. at P 100). Shortly thereafter, Krenek met with the plaintiff to discuss plaintiff's interest in again working at the news desk. (Id. at P 101). In April 2005, an opening became available in the newsroom on the Fold Desk. (Id. at P 104). Given plaintiff's expressed interest in returning to the news desk, Kreneck transferred plaintiff to the Fold Desk effective May 9, 2005. (Id. at P 105). The Fold Desk position required that plaintiff report to work one hour earlier than her current work schedule. (Id. at P 108). Plaintiff asked that she not be transferred to this position because she could not report to work by 11:00 a.m. given her personal responsibilities. (Id. at P 109). Krenek refused to rescind the transfer. (Id.). On May 9, 2005, the day plaintiff was scheduled to begin work on the Fold Desk, she resigned from Newsday. (Id. at P 111).

On September 25, 2003, plaintiff filed a complaint with the New York State Division of Human Rights, [*11] which was also filed with the Equal Employment Opportunity Commission. (Id. at 97). The EEOC issue plaintiff a Notice of Right to Sue dated April 19, 2004. (Id. at 98). Plaintiff filed the instant complaint on June 14, 2004 and on, June 6, 2006, amended her complaint to include a claim for retaliation as a result of her alleged constructive discharge on May 9, 2005.

II. DISCUSSION

A. Summary Judgment Standards

[HN1] "'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000)* (quoting *In re Blackwood Assocs., L.P. 153 F.3d*

*61, 67 (2d Cir. 1998)* and citing *Fed. R. Civ. P. 56(c)* and *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).* In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. See *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998).* [*12] If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. See *Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).* The applicable substantive law determines which facts are critical and which are irrelevant. See *Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

[HN2] The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski, 99 F.3d 505, 522 (2d Cir. 1996)* (quoting *Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).* When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular [*13] claim." *Jamaica Ash & Rubbish, 85 F. Supp. 2d at 180* (quoting *Celotex, 477 U.S. at 322).* A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).*

[HN3] "[T]he summary judgment standard applies with equal force to discrimination cases as it does to other cases." *Faruq v. Wal-Mart Stores, Inc., 2006 U.S. Dist. LEXIS 4676, *12 (W.D.N.Y. Jan. 23, 2006).* "The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." *Ashton v. Pall Corp., 32 F. Supp. 2d 82, 87 (E.D.N.Y. 1999)* (quoting *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)* (additional quotation marks omitted)). Thus, "[t]hough caution must be exercised in [*14] granting summary judgment where motive is genuinely in issue . . . [it] remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp., 109 F.3d 130,*

*135 (2d Cir. 1997)* (internal citations omitted). With these standards in mind, the court addresses the plaintiff's claims.

**B. Liability of Defendant Tribune Company**

As a threshold matter, the court addresses the defendants' argument that there is no basis for imposing liability on the Tribune Company as the parent company of the plaintiff's employer, Newsday, Inc. In support of this argument, the defendants have provided the declaration of Mary Ann Skinner, Newsday's Assistant Managing Editor for Editorial Administration, stating that Newsday's daily "operations and management are not interrelated with or controlled by Tribune" nor does the Tribune "participate in the day-to-day management of Newsday's business affairs, operations or employees." (Skinner Decl. at P 5). Further, she states that the "Tribune does not make personnel decisions regarding Newsday's employees . . . [and] did not make any decisions with regard to plaintiff Nancy Ruhling's [*15] employment at Newsday." (Id. at PP 5-6). In response, the plaintiff asserts that the "single employer doctrine" applies in this case because there is "'sufficient indicia of an interrelationship between the immediate corporate employer [Newsday] and the affiliated corporation [Tribune]'." (Plaintiff's Mem. at 13) (quoting *Schade v. Coty, Inc., No. 00 Civ. 1568 (JGK), 2001 U.S. Dist. LEXIS 8440, 2001 WL 709258, at *6 (S.D.N.Y. June 25, 2001)).* For the reasons that follow, the undisputed facts do not support a finding that the Tribune and Newsday are a single employer. Accordingly, the claims against the Tribune Company are dismissed.

[HN4] The Second Circuit has made clear that "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." *Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996).* In determining whether such circumstances are present, courts apply a flexible, four-part test that examines whether the related entities have: "(1) interrelated operations, (2) common management; (3) centralized control of labor relations, and (4) common ownership." *Id.; Schade, 2001 U.S. Dist. LEXIS 8440, 2001 WL 709258, at *6.* Satisfaction [*16] of all four factors is not required, nor is any one factor determinative. *Murray, 74 F.3d at 404.* Rather, "'[t]he critical question is what entity made the final decisions regarding employment matters related to the person claiming discrimination.'" *Id. at 405,* quoting *U.S. v. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993).*

[HN5] In determining whether there is a "sufficient interrelation of operation" between the related entities, courts have considered factors such as "whether the parent was involved directly in the subsidiary's daily business decisions; whether the two entities shared employ-

ees, services, records, or equipment; and whether the entities commingled assets or finances . . . ." *Ennis v. TYCO, Int'l Ltd., No. Civ 02-9070 (TPG), 2004 U.S. Dist. LEXIS 4329, 2004 WL 548796, at *4 (S.D.N.Y. March 18, 2004)* (citations omitted); *see also Schade, 2001 U.S. Dist. LEXIS 8440, 2001 WL 709258, at *7.* In addition, the requisite degree of control over labor relations has been established when the parent reviewed applications for employment at the subsidiary, approved personnel status reports, and approved all major employment decisions for the subsidiary. [*17] *See, e.g., Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235 (2d Cir. 1995).* The remaining factors, the degrees of common management and common ownership, "are considered less important, owing to the fact that 'they represent ordinary aspects of the parent-subsidiary relationship.'" *Ennis, 2004 U.S. Dist. LEXIS 4329, 2004 WL 548796, at *5* (quoting *Meng v. Ipanema Shoe Corp., 73 F. Supp.2d 392, 403 (S.D.N.Y. 1999).* With these standards in mind the court considers the evidence in this case.

Here, the plaintiff relies on the following undisputed facts in support of her contention that the Tribune and Newsday should be treated as a single employer: (1) the Tribune's Senior Counsel advised Newsday to stop accepting plaintiff's freelance articles for publication in May 2002; (2) Newsday employees including the plaintiff were shown a videotape featuring the Tribune's then-CEO John Madigan as part of its harassment prevention training in January 2003 wherein he advised employees with concerns relating to harassment to contact, among others, the Vice President of Human Resources at the Tribune's corporate office; (3) Newsday also distributed materials at the January 2003 [*18] training indicating that concerns over the anti-harassment policy could be brought to the attention of the Tribune's Corporate Human Resources; (4) when plaintiff sought to impart information concerning the harassment policy that she believed "reflected upon the image of corporate headquarters", the Tribune's Vice President of Human Resources responded and explained that Ruhling's concerns had been referred to her for investigation. These facts, however, do not indicate the level of day to day control over employment matters required by the single employment doctrine. There is simply no evidence that the Tribune made the final decisions regarding employment matters as they related to plaintiff. Thus, in the absence of evidence of the interrelation of operations or centralized control over labor relations between the Tribune and Newsday, there is no basis to find that they are a single employer. Accordingly, the claims against the Tribune are dismissed.

C. Ruhling's Claims of Age and Gender Discrimination

Ruhling claims that she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act of 1967 ("the ADEA"), *29 U.S.C. §§ 631 et seq.* [*19] and gender in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e, et seq.* Her claims of age and gender discrimination are also brought pursuant to the New York State Human Rights Law (the "NYSHRL"), *N.Y. Executive Law § 296* (McKinney's 2005).

[HN6] Title VII prohibits an employer from discriminating against an individual "with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000e-2(a)(1).* [HN7] The ADEA, which protects individuals over age forty from employment discrimination on account of their age, provides that it is "unlawful for an employer ... to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *29 U.S.C. § 623(a)(1); McCarthy v. New York City Technical College of the City of New York, 202 F.3d 161, 165 (2d Cir. 2000).* Similarly, [HN8] the NYSHRL prohibits discrimination against an employee in the "terms, conditions [*20] or privileges of employment" because of the individual's sex and age. *N.Y. Exec. Law § 296(1)(a)* (McKinney's 2005).

[HN9] To establish a prima facie case of gender or age discrimination, Ruhling must demonstrate that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the action permit an inference of discrimination. *See Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005)* (recognizing that framework established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* for Title VII claims of discrimination also applies to ADEA claims); *Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004)* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); Lightfoot v. Union Carbide, 110 F.3d 898, 913 (2d Cir. 1997)* (elements of an age discrimination claim "are essentially the same under the ADEA and the NYSHRL"); *David v. Comtech PST Corp., No. 03 CV 6480(JO), 2006 U.S. Dist. LEXIS 68208, 2006 WL 2713936, at * 7 (E.D.N.Y. Sept. 22, 2006)* [*21] ("The New York Human Rights Law affords similar protection as both Title VII and the ADEA, and is governed by the same legal standards as claims brought pursuant its federal law counterparts."). Although the burden of proving the prima facie case is de minimis, the claim fails if the

plaintiff cannot make out a prima facie case of discrimination. *Woodman, 411 F.3d at 76.*

Once the plaintiff has established the prima facie case, the burden of proof then shifts to the defendant to offer a non-discriminatory reason for the employment action at issue. See *Terry, 336 F.3d at 138,* citing *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Once this non-discriminatory reason is established, the presumption of discrimination arising with the establishment of the prima facie case drops from the matter. See *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).* Thereafter, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of [*22] fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry, 336 F.3d at 138,* citing *Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d. Cir. 1997).*

This final burden of showing pretext may be satisfied either by the introduction of additional evidence or by reliance on the evidence submitted in support of the prima facie case of discrimination. See *Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* The court must examine the entire record to determine whether the plaintiff "could satisfy the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000),* citing *Reeves, 530 U.S. at 143.* Guided by these standards, the court now turns to the substance of the plaintiff's claims.

I. Plaintiff's Prima Facie Case of Age and Gender Discrimination

The parties agree that Ruhling is a member of a protected class and that she was qualified for her job. Therefore, the court's analysis begins with [*23] the adverse employment action requirement. In this regard, the plaintiff claims that she suffered the following adverse employment actions: (1) her transfer from the News Desk to the Features Desk in March 2002; (2) her February 2003 one-day suspension resulting from use of her cell phone; (3) her one-day suspension in April 2003 for taking a personal day off; (4) the ban on the publication of her freelance work in May 2002; (5) the change of her work schedule in December 2002; (6) the excessive monitoring of her daily activities; (7) the denial of advancement opportunities; (8) the January 2003 reprimand, and (9) her transfer to the Fold Desk in April 2005.

The defendants acknowledge that the first three actions alleged by the plaintiff, namely, her transfer from the News Desk to the Features Desk in March 2002, her

February 2003 one-day suspension for her refusal to silence her cell phone, and her one-day suspension in April 2003 for taking an unauthorized personal day off, are adverse employment actions. However, with regard to the plaintiff's transfer from the News Desk to the Features Desk in March 2002, the defendants argue that this claim is untimely because it accrued more [*24] than 300 days before she filed an administrative charge of discrimination. Plaintiff does not dispute that this claim would ordinarily be untimely, however, she urges that the continuing violations theory may be applied to save this claim. The court disagrees. [2]

> 2  As discussed *infra*, the plaintiff may, however, rely on this transfer in establishing her hostile work environment claim.

[HN10] Under Title VII and the ADEA, a plaintiff must file an administrative charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days after a claim accrues. *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998).* "This [300-day] requirement functions as a statute of limitations, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court." *Id. at 763.* Here, the plaintiff dual filed her charge of discrimination with the State Division of Human Rights and the EEOC on September 25, 2003. Thus, [*25] the March 2002 transfer occurred outside the 300-day period and is untimely.

[HN11] While the continuing violations doctrine may extend the limitations period for claims of discriminatory acts committed under an ongoing policy of discrimination, it is limited in application and does not preserve untimely claims related to "discrete, completed employment actions such as transfers, . . . ." *Sundram v. Brookhaven National Laboratories, 424 F. Supp.2d 545, 560 (E.D.N.Y. 2006)* (citing *Griffin v. New York City Off-Track Betting Corp., 2002 U.S. Dist. LEXIS 2793, 2002 WL 252758, at *2 (S.D.N.Y. Feb. 20, 2002))* (citing *Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1992)* (add'l citations omitted). The Supreme Court has explained that, notwithstanding the continuing violations doctrine, because a discrete discriminatory act occurs on the day that it happened, a party must file her charge within 300 days of the act or lose the ability to recover for it. *AMTRAK v. Morgan, 536 U.S. 101, 113-14, 122 S. Ct. 2061, 2072-73, 153 L. Ed. 2d 106 (2002)* (reversing application of the continuing violations doctrine to what the Ninth Circuit Court of [*26] Appeals termed 'serial violations' because "discrete discriminatory acts are not actionable if time-barred even when they are related to act alleged in timely filed charges."). Accordingly, the plaintiff's discrimination claim to the extent it is based on her March 2002 transfer is untimely.

Given the defendants' acknowledgment that the plaintiff suffered at least two timely adverse employment actions (namely her suspensions in February and April 2003) there is no dispute that adverse employment action requirement of the plaintiff's prima facie case is satisfied.[3] The court must next consider whether the circumstances surrounding these actions permit an inference of age or gender discrimination.

> 3  The court therefore finds it unnecessary at this time to address the question whether the remaining employment actions asserted by plaintiff constitute adverse employment actions within the meaning of the law.

a) Claim of Age Discrimination:

The gravamen of the plaintiff's complaint is essentially that in January [*27] 2002 Newsday, as part of a cost-cutting effort and in an effort to reduce staff, offered the plaintiff and other senior employees a buyout. Plaintiff asserts that following her decision not to take the buyout, Newsday targeted her for removal by subjecting her to a campaign of harassment intended to drive her out the door. Thus, within days of her decision not to take early retirement, she was transferred from the news desk to a less prestigious assignment on the Features Desk. While the transfer itself is not actionable because it is untimely, its temporal proximity to the plaintiff's decision not to take early retirement would permit a reasonable fact finder to conclude that Newsday was embarking on a course of conduct aimed at ridding itself of an older employee. The record also indicates that following plaintiff's refusal to take the buyout she was subjected to reprimand, multiple suspensions, unwelcome transfers and schedule changes all of which plaintiff claims occurred because of her refusal to take early retirement. Against these facts, the court finds that the plaintiff has set forth sufficient facts to sustain her minimal burden of stating a prima facie case of age discrimination. [*28] *Abrahamson v. Board of Educ. of the Wappingers Falls Central School District, 374 F.3d 66, 72 (2d Cir. 2004).*

II. The Defendants' Reasons For Their Actions

Having established a prima facie case of age discrimination, the burden shifts to the defendants to establish legitimate, nondiscriminatory reasons for the alleged adverse employment actions. That burden is satisfied. With regard to her transfers (and related changes in her work schedule), the defendants have articulated that the decisions to transfer the plaintiff were made to better suit her skills, work performance and expressed assignment preference. Similarly, the defendants state that the suspensions were imposed because the plaintiff was insub-

ordinate and failed to follow Newsday's policies and procedures.

[HN12] "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. Thus, 'the defendant need not persuade the court that it was actually motivated by the proffered reasons" in order to nullify the presumption and obligate the plaintiff to satisfy the burden. If the defendant articulates a non-discriminatory reason, 'the presumption raised by the prima facie case [*29] is rebutted, and the factual inquiry proceeds to a new level of specificity.'" *Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)* (internal citations omitted). The evidence submitted by the defendants concerning each of the actions at issue establish for the purposes of this motion, a legitimate, non-discriminatory reason the actions taken. Thus, the burden shifts back to the plaintiff to show that the reasons articulated were a pretext for age discrimination.

III. The Plaintiff's Evidence of Pretext

[HN13] To satisfy her burden of showing that the reasons articulated by the defendants were a pretext for age discrimination, the plaintiff need not come forward with evidence in addition to that presented in support of her prima facie case. Instead, she may rely on her prima facie case 'combined with sufficient evidence to find that the employer's asserted justification is false.' See *Reeves, 530 U.S. at 148.* As permitted by Reeves, the plaintiff relies primarily on the same evidence in support of her prima facie case.

The ultimate question for the court is whether, upon examination of the entire record, the plaintiff "could satisfy [*30] the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel, 232 F.3d at 90-91*, quoting *Reeves, 530 U.S. at 148.* Here, there are issues of fact regarding the reasons for the defendants' actions, and based on those facts, the plaintiff may be able to persuade a jury that the defendants discriminated against her. For example, with regard to the conduct giving rise to the suspensions in 2003, the fact that the plaintiff appears never before to have been punished for that same conduct prior to refusing the buyout evidences that the defendants' proffered reasons may be pretextual. Similarly, at the same time that the plaintiff was transferred from the Night News Desk to the Features Desk other Assistant Editors were being transferred from the Features Desk to the Night News Desk. Defendants do not explain why it was necessary to move the plaintiff at that time. Nor do the defendants explain their decision to transfer plaintiff just two days after she declined the buyout. Moreover, although defendants claim to have been making assignments based upon plaintiff's expressed preferences, [*31] the record suggests other-

2007 U.S. Dist. LEXIS 116, *

wise. Indeed, as alleged by plaintiff she did not welcome the transfer to the Features Desk and objected to changes made to her schedule in December 2002 as well as her transfer to the Fold Desk in January 2005. Newsday's insistence on these changes apparently led to plaintiff's resignation. Thus, the court finds that the plaintiff has met her burden to show that the explanation offered by the defendants may have been a pretext for age discrimination. Accordingly, the defendants' motion for summary judgment on the plaintiff's age discrimination claims is denied.

b) Claims of Gender Discrimination:

In contrast to the plaintiff's claim of age discrimination, the court finds that she has failed to present any evidence giving rise to an inference of gender discrimination. The only allegation that even remotely refers to gender occurred in December 2002, when Millrod changed plaintiff's schedule over that of a male colleague. As an initial matter it should be noted that [HN14] a schedule change standing alone does not constitute an adverse employment action. *Harris v. City of New York*, No. 03 CV 1593 (DLI), 2006 U.S. Dist. LEXIS 48358, 2006 WL 2034446, at *4 (E.D.N.Y. July 17, 2006) [*32] (no adverse employment action based on denial of shift change request absent any evidence that the denial led to a materially adverse change to the terms and conditions of plaintiff's employment); *Rivera v. Potter*, No. 03CV 1991 (LAP), 2005 U.S. Dist. LEXIS 1416, 2005 WL 236490, at *5 (S.D.N.Y. Jan. 31, 2005) (unwanted schedule change not an adverse employment action); *Bright v. LeMoyne College*, 306 F. Supp.2d 244, 253 (N.D.N.Y. 2004) ("That plaintiff expressed a preference for one shift is insufficient to conclude that her transfer was an adverse employment action."); *DeMars v. O'Flynn*, 287 F. Supp.2d 230, 245-46 (W.D.N.Y. 2003) ("[P]lacement of plaintiff on the day shift versus the night shift [did not] constitute [] an adverse employment action."); *see also Ifill v. UPS*, No. 04 CV 5963 (LTS), 2005 U.S. Dist. LEXIS 5230, 2005 WL 736151, at * (S.D.N.Y. March 29, 2005) ("[A] lateral transfer, even if imposed on an employee involuntarily, does not constitute an adverse employment action unless it is accompanied by some other material adverse change in conditions, such as a reduction in pay or status."). More importantly, plaintiff's own testimony [*33] concerning this event reveals that Millrod's decision was based not on gender but on his practice of rewarding loyalty. (Ruhling Dep. at 263-64, 275-279). Plaintiff does not dispute that the decision to change her schedule was based on Millrod's desire to reward persons who joined the co-ed softball team. Indeed, she acknowledged that female employees also may have benefitted from Millrod's practice of rewarding loyalty. (Id. at 278-80, 284; Plaintiff's Mem. at 4; Pl's R. 56.1 Statement at P 31). Finally, plain-

tiff concedes that when she complained about her transfer she did not assert that it was based on gender discrimination. (Ruhling Dep. at 279-80). Plaintiff's own assessment that this employment decision was made based on loyalty, not gender, is fatal to her gender discrimination claim. *Scaria v. Rubin*, No. 94 Civ. 3333(AJP), 1996 U.S. Dist. LEXIS 9659, 1996 WL 389250, at *11 (S.D.N.Y. July 11, 1996) ("'favoritism' based on proven performance is surely a valid reason for promotion, and one that is used every day"), aff'd, 117 F.3d 652 (2d Cir. 1997); *Rivera v. Nat'l Westminster Bank*, 801 F. Supp. 1123, 1133 n. 13 (S.D.N.Y. 1992).

[HN15] The law is clear that [*34] a plaintiff must present more than "mere speculation and conjecture" to defeat summary judgment. *Heneghan v. New York City Admin. for Children's Services*, No. CV 03-2992 (BMC), 2006 U.S. Dist. LEXIS 64849, 2006 WL 2620430, *3 (E.D.N.Y. Sept. 12, 2006) (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)[HN16] Because liability depends upon whether the plaintiff's gender actually motivated the defendants' decision, there simply can be no liability where there is a paucity of evidence that the plaintiff's gender "actually played a role in [the employer's gender "decisionmaking"] process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141. Given the total lack of evidence of gender discrimination, these claims are dismissed. See *Fed. R. Civ. P. 56(e)*.

D. Ruhling's Claims of Disability Discrimination

Plaintiff alleges that the defendants discriminated against her on account of her disability, namely repetitive stress injury ("RSI") and failed to reasonably accommodate that disability. [HN17] The ADA and the NYSHRL prohibit discrimination against persons with disabilities in the terms, conditions and privileges [*35] of employment. 42 U.S.C. § 12112(a); N.Y. Exec. Law § 296(1)(a) (McKinney's 2005). The court first addresses her claims of disability discrimination.

1. Disability Discrimination

The plaintiff's disability discrimination claim is subject to the McDonnell Douglas burden shifting framework. [HN18] Under the ADA, a prima facie case of disability discrimination requires that the plaintiff show that: (1) the defendants are subject to the ADA; (2) the plaintiff has a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action as a result of her disability. *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005). Here, the defendants do not dispute that they are subject to the ADA or that the plaintiff was qualified to

Case 1:08-cv-01333-LAP    Document 11-6    Filed 07/17/2008    Page 3 of 12

Page 15
2007 U.S. Dist. LEXIS 116, *

perform the essential functions of her job. Rather, they claim that plaintiff is not disabled as a matter of law. They further assert that she has suffered no adverse employment action as a result of her alleged RSI.

[HN19] To establish a [*36] disability within the meaning of the ADA, the plaintiff must establish either that (1) she suffers from a physical or mental impairment that "substantially limits" one or more "major life activities"; (2) "has a record of such impairment"; or (3) "is regarded as" having such an impairment. *42 U.S.C. § 12102(2); LaBella v. New York City Admin. For Children's Services, 2005 U.S. Dist. LEXIS 18271, 2005 WL 2077192, at *10 (E.D.N.Y March 28, 2005).* "Irrespective of whether a plaintiff's claim is based on actual, recorded or perceived disability, the disability must be an impairment covered by the ADA, that is, the disability is one that substantially limits a major life activity." *LaBella, 2005 U.S. Dist. LEXIS 18271, 2005 WL 2077192 at *10, citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645-46 (2d Cir. 1998).*

Defendants contend that the plaintiff has not supported her claim that her RSI substantially limits a major life activity. In this regard, the plaintiff contends that she has sufficiently established that she is disabled because her "ability to walk, sit, sleep, garden, turn her neck, drive, and keyboard are all substantially limited by her RSI." [*37] (Pl. Mem. at 29). Plaintiff also claims that her RSI substantially limits the major life activity of working. (Pl. Mem. at 5).

In *Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002),* cited by both parties, the Supreme Court clarified that [HN20] "to be substantially limited in performing manual tasks, an individual must have a impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Id. at 198.* The Supreme Court explained that because there are "large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA." *Id. at 199.* Thus, the Court considered whether the plaintiff's medical impairments, that caused her "to avoid sweeping, quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances, established a manual task disability [*38] as a matter of law. *Id. at 202.* Concluding that they did not, the Court found that "these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives." *Id.* Similarly, courts in this Circuit that have examined this issue and found that by and large carpal

tunnel syndrome or similar limitations on repetitive motion do not substantially limit a major life activity. See *Matya v. Dexter Corp., No. 97 CV 763(JTC), 2006 U.S. Dist. LEXIS 18358, 2006 WL 931870 (W.D.N.Y. April 11, 2006)* (noting that difficulty sleeping is a common problem and that plaintiff's claim that this condition resulted from his carpal tunnel syndrome was insufficient to show a substantial limitation in this major life activity); *Mikell v. Waldbaum, Inc., No. 02 Civ. 1501 (LBS), 2003 U.S. Dist. LEXIS 7522, 2003 WL 21018844 (S.D.N.Y. May 5, 2003)* (dismissing ADA claim despite plaintiff's claim that her carpal tunnel syndrome and bursitis significantly restricted her ability to work, perform household chores, walk, or get dressed); *Balonze v. Town Fair Tire Ctrs., Inc., No. 02Cv 2247(WWE), 2005 U.S. Dist. LEXIS 5317, 2005 WL 752198 (March 31, 2005)* (finding [*39] plaintiff was not disabled under the ADA despite the fact that her RSI caused her to have difficulty braiding her hair, opening jars, folding clothes and lifting laundry and groceries); *Serrano v. Terence Cardinal Cooke Health Care Ctr., No. 99 CV 5998, 2002 U.S. Dist. LEXIS 16981, 2002 WL 31027183 (E.D.N.Y. Sept. 9, 2002)* (plaintiff not disabled under the ADA because there was no evidence that her carpal tunnel syndrome substantially limited her ability to work); *Cutler v. Hamden Board of Educ., 150 F. Supp.2d 356 (D. Conn. 2001)* (citing more than fifteen cases granting summary judgment where plaintiff alleged an impairment of carpal tunnel syndrome but failed to demonstrate that she was substantially limited in a major life activity).

Applying these standards, the record does not support plaintiff's claim that her impairment substantially limited any major life activity. Plaintiff's own account of her injury indicates that, when her RSI is "at its worst" she "can't sleep on that side", has "difficulty carrying things" such as a briefcase or purse, and can't walk or sit in a chair for a long period of time because it becomes uncomfortable. (Ruhling Dep. at 149-150). She also [*40] conceded, however, that she can walk "unlimited" distances on a daily basis and that she is able to groom herself, clean her house, drive her car and turn her neck although "that bothers me". (Id. at 150-152). Particularly compelling is the fact that despite her RSI she continued working without accommodation for two years until April, 2005 when she asked and was allowed to limit her keyboarding to four hours each day while otherwise performing full time work. Given the absence of any evidence that would indicate a substantial limitation of any major life activity, the facts fail to demonstrate that the plaintiff was disabled under the ADA.

## 2. Perceived Disability

The plaintiff also claims that the defendants perceived her as disabled and discriminated against her based on that perception (Suppl. Compl. at P 94).

[HN21] Under the third method of establishing a disability under the ADA, a plaintiff must show that she "is regarded as" having an impairment that substantially limits one or more major life activities. *42 U.S.C. § 12102(2)(C).* "Whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore [*41] 'a question of intent, not whether the employee has a disability.'" *LaBella, 2005 U.S. Dist. LEXIS 18271, 2005 WL 2077192, at *15,* quoting *Francis v. Meriden, 129 F.3d 281, 284 (2d Cir. 1997).* While "'the decisive issue is the employer's perception of his or her employee's alleged impairment," the plaintiff must show that the employer "'regarded her as disabled within the meaning of the ADA'.'" *LaBella, 2005 U.S. Dist. LEXIS 18271, 2005 WL 2077192, at *15,* quoting *Colwell, 158 F.3d at 646,* citing *Francis, 129 F.3d 281, 285-86.*

Apart from her allegation that she was "perceived by the Defendants and their agents as having a physical or mental impairment that substantially limits one or more of Ms. Ruhling's major life activities," (Suppl. Compl. at P 94), the plaintiff has not addressed her perceived disability discrimination claim in her papers and has provided no support for this claim. In fact, plaintiff's perceived disability claim is undermined by her statement that Liane Guenther (the supervisor that issued the January 2003 reprimand to Ruhling for failing to properly format quotation marks) "alluded to the fact that she thought I was faking my RSI and [*42] in conversations with me she claimed I was typing furiously away on my computer doing work that was not Newsday-related right after I said my arms were hurting." (Pl. errata sheet to her deposition referencing page 426, line 15, submitted as "Ex. C" to plaintiff's exhibits). Thus, plaintiff herself acknowledges that the defendants did not perceive her to be disabled within the meaning of the ADA. Because the plaintiff is not disabled for purposes of the ADA, her claims under this statute must be dismissed.

### 3. State Law Disability Discrimination Claim

[HN22] While disability claims under the ADA and the NYSHRL are subject to the same analytical framework, the NYSHRL has a more expansive definition of "disability" and does not require a plaintiff to identify a major life activity that is substantially limited by the alleged impairment. *Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 154-55 (2d Cir. 1998); Jones v. Gov't Emples. Ins. Co., No. 04-3492(WDW), 2006 U.S. Dist. LEXIS 29277, 2006 WL 1229136, at *5 (E.D.N.Y. May 8, 2006)* ("The definition of disability is broader under the HRL than it is under the ADA."); *Matya, 2006 U.S. Dist. LEXIS 18358, 2006 WL 931870 at *6 [*43]* ("[U]nder state law, a disability need only be a demonstrable impairment; it does not have to substantially limit a major life function."). Here, the defendants

do not dispute that the plaintiff is disabled under the NYSHRL. (Defs. Mem. at 28, n. 5). Accordingly, the court examines the plaintiff's state law claim of disability discrimination.

The dispute centers around the fourth requirement of the prima facie case, namely whether the plaintiff suffered an adverse employment action as a consequence of her disability. In this regard, the plaintiff broadly claims in her complaint that the same nine actions which gave rise to her age and gender discrimination claims also constituted adverse actions taken against her on account of her disability.

It is undisputed that despite the fact that the plaintiff advised the defendants that she was suffering from a recurrence of her RSI and could not perform certain tasks in December 2002 and January 2003, she was issued a reprimand for failing to complete such tasks. On the heels of this reprimand, in February and again in April 2003, plaintiff asserts she was singled out and suspended for conduct which, according to plaintiff, was [*44] long established acceptable conduct. Significantly, the reprimand and suspensions occurred after nearly eighteen years of plaintiff's continued employment without incident. As detailed supra, the defendants' have acknowledged that the February and April 2003 suspensions constitute adverse employment actions. A reasonable jury could find an inference of disability discrimination on this basis. The court finds, therefore, that the plaintiff has set forth sufficient facts to sustain her minimal burden of stating a prima facie case of disability discrimination under the NYSHRL.

Having established a prima facie case of disability discrimination, the burden shifts to the defendants to establish legitimate, nondiscriminatory reasons for the adverse employment actions. See *Heyman, 198 F.3d at 72.* That burden is satisfied. With regard to the suspensions and reprimands, as noted, the defendants state that the plaintiff was insubordinate and failed to follow Newsday's policies and procedures. Thus, the burden shifts back to the plaintiff to show that the reasons articulated were a pretext for disability discrimination.

To satisfy her burden of showing that the reasons [*45] articulated by the defendants were a pretext for disability discrimination, the plaintiff relies primarily on the same evidence in support of her prima facie case. There are plainly issues of fact regarding the reasons for the defendants' actions, and based on those facts, the plaintiff may be able to persuade a jury that the defendants discriminated against her on the basis of her disability. For example, a reasonable fact-finder could conclude that the temporal proximity of the 2003 suspensions to the recurrence of the RSI injury coupled with the fact that the plaintiff had never before been penalized for

that same conduct evidences that the defendants' proffered reasons may be pretextual. A jury could infer discrimination based upon the fact that the plaintiff was reprimanded in 2003 for not performing tasks which were made difficult because of her RSI. Thus, plaintiff has satisfied her burden on the pretext requirement and the defendants' motion for summary judgment as to her state law disability discrimination claim is denied.

### 4. State Law Failure to Accommodate Claim

Plaintiff also alleges that the defendants' failure to reasonably accommodate her disability gives rise [*46] to a disability discrimination claim under the NYSHRL.[HN23] The NYSHRL prohibits an employer from discriminating against a disabled employee in "terms, conditions or privileges of employment" and the failure to provide a reasonable accommodation is a form of discrimination under the statute. *N.Y. Exec. Law §§ 296(1)(a); 296 (3)(a)* ("It shall be an unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities of an employee . . . ."). [4] A failure to accommodate claim requires a plaintiff to allege facts showing that: (1) she has a disability; (2) with or without reasonable accommodation she was qualified to perform the essential functions of the job; (3) the employer discriminated against her because of her disability. *Cameron v. Community Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003); Powers v. Polygram Holding, Inc., 40 F. Supp.2d 195, 198 (S.D.N.Y. 1999).* A disability discrimination claim alleging a failure to accommodate under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims. *Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 n.3 (2d Cir. 2006).* [*47]

4    Implicit in the statute is the requirement that the accommodation enable the employee to continue to enjoy or perform the terms, conditions or privileges of employment. This court found no case in which a reasonable accommodation claim was asserted where, as here, the record reflects that the employee, either with or without the accommodation, was able to continue working and was in no danger of having the terms, conditions or privileges of employment changed.

Here, the dispute centers around the second element of the prima face case, whether the plaintiff, with a reasonable accommodation, was "qualified" to perform the essential functions of her job duties. There is no question that the plaintiff initially requested a facially reasonable accommodation in seeking either a change of her work days, or the ability to report to work an hour later twice a week for four weeks. However, [HN24] the NYSHRL envisions that an employer and a disabled employee will work together to find a satisfactory accommodation. *9 NYCRR § 466.11(j)* [*48] and *(k); Hayes v. Estee Lauder Co., Inc., 34 A.D.3d 735, 825 N.Y.S.2d 237, 2006 N.Y. App. Div. LEXIS 14363, 2006 WL 3444258, at * 1 (2d Dep't Nov. 28, 2006).* Ultimately, the choice as to which of several reasonable accommodations will be implemented is left to the sound discretion of the employer. [HN25] See *29 C.F.R. § 1630.9* ("The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability . . . . .[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations and may choose the less expensive accommodation or the accommodation that is easier for it to provide."); *Cormier v. City of Meriden, 420 F. Supp.2d 11 (D. Conn. 2006)* ("The ADA does not necessarily entitle plaintiff to her preferred accommodation so long as the offered one does not create a significant burden on her."); *Hoyt v. NYNEX Corp., No. 94 CV 218 (RSP), 1996 U.S. Dist. LEXIS 14230, 1996 WL 550374, at *4 (N.D.N.Y. Sept. 25, 1996)* ("an employer is not required to provide every accommodation the disabled employee requests, so long as the accommodation provided [*49] is reasonable.").

In response to the plaintiff's proposal and consistent with its statutory obligations, the defendants offered her two alternatives: (1) the opportunity to work a split-shift, which would allow her to leave work mid-shift to attend physical therapy, or (2) the opportunity to apply for short term leave under the Family and Medical Leave Act ("FMLA"). [5] The court must examine whether the defendants' counterproposal satisfied their obligation to provide a reasonable accommodation. Here, the split-shift alternative offered by the defendants reasonably met the plaintiff's stated need -- time to attend physical therapy. (Ruhling Dep. at. 101,107, 117, 119-20, 130, 133). The plaintiff claims that the split-shift option was unreasonable because at some unspecified time in the past, for some unspecified reason she had tried to work a split-shift and was told that she could not do so. (Pl. 56.1 Counterstatement at P 60; Ruhling Dep. at 128-130, 138-39). This argument ignores the fact that unlike her prior experience, plaintiff was given specific written permission by her employer to work a split-shift. (Ruhling Dep. Exs. 11, 14). Plaintiff did not try the split-shift option [*50] after being given permission to do so and therefore had no idea whether it would present any difficulties. (Ruhling Dep. at 128). Plaintiff also argues that the split-shift option was unreasonable because it would increase the amount of driving she would have to do each day. (P. Mem. at 6; Ruhling Dep. at 130). This argument is simply unavailing. The record indicates that plaintiff did not begin work until 12:30 p.m. each day. She had ample time in the morning to seek treatment without any

disruption to her work schedule. Instead, plaintiff insisted that Newsday change her work schedule so as not to cut into her personal time in the morning. Newsday acceded to this somewhat questionable demand by offering her the split-shift option. Notwithstanding this accommodation, plaintiff nonetheless considered the split-shift option inconvenient and rejected it. The fact that plaintiff may have preferred her own proposal does not render the defendants' proposal unreasonable. The defendants' proposal addressed each of plaintiff's stated demands i.e. that she be given time for therapy and that she not be required to use her personal time for treatment. Having failed to demonstrate that the [*51] defendants refused to provide her a reasonable accommodation, the plaintiff's failure to accommodate claim is dismissed. [6]

> 5  The record is unclear as to whether the defendants' proposal was for paid leave.
>
> 6  Given the finding that the split-shift proposal was reasonable, the court need not reach the question of whether the leave option was also reasonable. The court notes, however, that a short-term leave of finite duration may be a reasonable accommodation. *Stamey v. NYP Holdings, Inc.*, 358 F. Supp.2d 317, 327 (S.D.N.Y. 2005) (concluding that while a short term leave of absence of finite duration is reasonable, a request for leave without a return date was unreasonable as a matter of law).

E. Hostile Work Environment Claims

The plaintiff also asserts hostile work environment claims pursuant to Title VII, the ADEA, the ADA and the NYSHRL based upon the cumulative effect of the defendants' actions. [7]

> 7  As noted, this court has determined that plaintiff was not the victim of gender discrimination thereby eliminating gender as a basis for relief under either a claim of hostile working environment or constructive discharge. Additionally, given the court's conclusion that the plaintiff was not disabled under the ADA, there can be no liability on her federal disability discrimination claim on the theories of hostile working environment or constructive discharge.

[*52] [HN26] A plaintiff establishes a hostile work environment claim by showing that "[t]he workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477

U.S. 57, 65, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986)); see also *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L. Ed. 2d 204 (2004); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995). In assessing the overall hostility of a workplace, charges of discrimination must be "considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997). "The incidents comprising a hostile work environment need not make any reference to the trait or condition on the basis of which the discrimination has occurred, so long as the [*53] incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island, No. 01 CV. 7550(SJ)*, 2003 U.S. Dist. LEXIS 25816, 2003 WL 21143076, at *2, citing *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001).

[HN27] Hostile work environment claims brought under the ADEA and the NYSHRL are analyzed under the same standards. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 316-17 (2d Cir. 1999) ("Employment discrimination claims brought under the NYSHRL are analyzed identically to claims under the ADEA and Title VII."); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006) (same standards apply to disability discrimination claims brought under the NYSHRL and the ADA). A plaintiff who brings a hostile work environment claim must prove that: (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *Brennan*, 192 F.3d at 318 (ADEA and Title VII claims) [*54] ; *Ferraro*, 440 F.3d at 100 (NYSHRL claims); *Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp.2d 590, 598-99 (S.D.N.Y. 2002) (ADA claim) (citations omitted). Although there is no "threshold magic number of harassing incidents that gives rise, without more, to liability," *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (quoting *Richardson v. New York Department of Correctional Services*, 180 F.3d 426, 439 (2d Cir. 1999)) (internal punctuation omitted), the plaintiff must demonstrate either that "a single incident was extraordinarily severe" or that "a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citations and internal quotation marks omitted). The Second Circuit has instructed that "the appalling conduct alleged in prior cases should not mark the boundary of what is actionable. *Richardson*, 180 F.3d at 439. Rather, "[t]he test is whether 'the harassment is of such quality or quantity that a reasonable employee [*55]

2007 U.S. Dist. LEXIS 116, *

would find the conditions of her employment altered for the worse.'" *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000)* (quoting *Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997)*).

As a threshold matter, the court addresses the issue of timeliness of these claims to the extent that the plaintiff relies on conduct occurring before November 29, 2002 (300 days before her September 25, 2003 complaint to the NYSDHR).[HN28] "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *AMTRAK v. Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 2074, 153 L. Ed. 2d 106 (2002)*. Because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice, a hostile work environment claim will be timely so long as "one act contributing to claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for purposes of determining liability.'" *Sundram, 424 F. Supp.2d at 560* (quoting *Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)* [*56] (quoting *Morgan, 536 U.S. at 117, 122 S. Ct. at 2074*). Thus, given that there are several alleged acts contributing to her hostile work environment claims that occurred within the statutory period, the court may properly consider the entire time period of the alleged hostile environment.

Plaintiff claims that the cumulative effect of the following acts created a hostile work environment based on her age and disability: (1) her transfer from the News Desk to the Features Desk in March 2002; (2) her February 2003 one-day suspension for her refusal to silence her cell phone; (3) her one-day suspension in April 2003 for taking an unauthorized personal day off; (4) the ban on the publication of her freelance work in May 2002; (5) the change of her work schedule in December 2002; (6) the excessive monitoring of her daily activities; (7) the denial of advancement opportunities; (8) the January 2003 reprimand, and (9) her transfer to the Fold Desk in April 2005.

As noted, the defendants concede that plaintiff is a member of a protected class. The parties dispute, however, the remaining elements of a prima face case of hostile work environment. There are plainly issues [*57] of fact with respect to whether the workplace was permeated with discriminatory intimidation severe enough to alter the conditions of the plaintiff's work environment. The defendants refute the facts relied upon by the plaintiff to prove her claim. The fact-finding required to accept the defendants' version of the events is not an exercise that may be carried out in the context of a motion for summary judgment.

The analysis does not end here, however, given the defendants' assertion that they have established the Faragher/Ellerth affirmative defense to the plaintiff's hostile work environment claims and therefore this claim should be dismissed. (Defs' Mem. at 22; see *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*; *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*). Defendants' argument, however, ignores clearly established law that [HN29] the Faragher/Ellerth affirmative defense is unavailable where the actions complained of emanate from the employer through its supervisory personnel. *Faragher, 524 U.S. at 807, 118 S. Ct. at 2293*; *Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270*; see also *Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159 L. Ed. 2d 204 (2004)*; [*58] *Huaman v. Am. Airlines, Inc., No. 00 CV 6336 (FB), 2005 U.S. Dist. LEXIS 21777, 2005 WL 2413189, *3 (E.D.N.Y. Sept. 29, 2005)*. Accordingly, for the reasons detailed above, the defendants' summary judgment motion on the plaintiff's age and state law disability based hostile work environment claims is denied.

F. Constructive Discharge Claim

The plaintiff's next claim is for constructive discharge brought under the ADEA and the NYSHRL. Ruhling alleges that her May 2005 transfer to the Fold Desk was a constructive discharge. [HN30] Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. *Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)*, citing *Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir. 1998)*; *Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 89 (2d Cir. 1996)*. According to the Second Circuit, "working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to [*59] resign.'" *Terry, 336 F.3d at 152*, quoting *Chertkova, 92 F.3d at 89*. A prima facie case of constructive discharge requires that the plaintiff establish that the alleged constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in [a protected] class." *Terry, 336 F.3d at 152*, quoting *Chertkova, 92 F.3d at 91*.

On this record, the court finds that the plaintiff has presented sufficient evidence to allow a reasonable factfinder to conclude that a reasonable person in her position would have felt compelled to resign. First, as discussed previously, the plaintiff has made a sufficient showing for a reasonable trier-of-fact to find that she was experiencing a hostile work environment. See supra at

30-34. Second, the undisputed facts establish a series of adverse events following her declination of the early retirement incentive and the recurrence of her RSI injury including, changes to her work schedule and job assignment, reprimands and suspensions, all of which would permit a reasonable person to infer that she. was not wanted as an employee [*60] because of her age and/or disability. This conclusion is further bolstered by the fact that although the plaintiff had consistently advised the defendants that she could not work in the mornings, her final assignment was to a position which required her to work mornings. See, e.g., *Karn v. Williams Advanced Materials, No. 02 CV 852, 2006 U.S. Dist. LEXIS 10458, 2006 WL 361973 (W.D.N.Y. Feb. 15, 2006)* ("'A transfer of an employee to a job the employer knows or should know the employee cannot perform can constitute an adverse employment action'."), quoting *Jackson v. Heidelberg, LLC 2005 U.S. Dist. LEXIS 6350, 2005 WL 735961, *5 (W.D.N.Y. 2005)*. As Ruhling describes, the transfer to the Fold Desk was the "proverbial straw that broke the camel's back." (Pl. Mem. at 15). The plaintiff has put forth sufficient evidence to allow a trier-of-fact to conclude that the constructive discharge occurred under circumstances giving rise to an inference of age and/or disability discrimination. Plaintiff does not allege that just a single event caused her to be constructively discharged, but rather that her discharge resulted from the cumulative conduct of the defendants. (Pl. Mem. at 14). This is sufficient to state a valid [*61] claim for constructive discharge. *Chertkova, 92 F.3d at 90* (recognizing that[HN31] a constructive discharge claim can be premised on the cumulative affect of a number of adverse conditions in the workplace). Since Ruhling has put forth sufficient evidence for a trier-of-fact to conclude that a reasonable person would have felt compelled to leave her job, and that this resulted from an improper motive, summary judgment is inappropriate.

The defendants again assert the Faragher/Ellerth affirmative defense in connection with this claim. As previously explained, this defense is unavailable where the conduct complained of is employer sanctioned. See supra at 34. The Supreme Court has made clear that [HN32] where an employee "quits in reasonable response to employer-sanctioned adverse action officially changing her employment status or situation" the affirmative defense is unavailable. *Suders, 542 U.S. at 134, 124 S. Ct. at 2347.* Since the plaintiff's constructive discharge claim is based on conduct of her employer, this affirmative defense is clearly unavailable. The defendants' motion as to the plaintiff's constructive discharge claims is therefore denied.

[*62] G. Plaintiff's Retaliation Claims

The court next addresses the plaintiff's claims brought pursuant to the anti-retaliation provisions of the Title VII, the ADEA, the ADA and the NYSHRL. These statutes [HN33] prohibit retaliation against any employee who makes a complaint against her employer regarding any practice made unlawful by these statutes. See *42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a); N.Y. Exec. Law § 296(1)(e).* These statutes contain similar provisions against retaliation and are governed by the same standards. *Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)* (Title VII); *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)* (ADA and NYSHRL); Devlin v. Transp. Communs. Int'l Union, Nos. 95 Civ. 742 (JFK), 95 Civ. 10838 (JFK), *2002 U.S. Dist. LEXIS 4339, 2002 WL 413919, at *12* (ADEA and NYSHRL).

Here, the plaintiff alleges that the defendants engaged in a course of retaliation against her. More specifically, she alleges that, almost immediately after commencing her employment at Newsday in 1984, she [*63] was sexually harassed by her supervisor and reported that harassment to "the appropriate persons within the Defendants' chain of command shortly after the harassment commenced." (Suppl. Compl. at PP 17-18). According to the plaintiff, as a result of that report, she has been "continuously and systematically retaliated against in various ways by the defendants." (Id. at P 19). Plaintiff also claims that, following her decision to decline the buyout, the defendants subjected her "to an ongoing barrage of . . . retaliatory actions . . . all as a result of [her] opting not to take the buyout." (Id. at P 32). She further asserts that she suffered retaliation as a result of the internal complaints she made in December 2002 when she complained about Millrod's favoritism and in January 2003 when she contacted the then-CEO of Newsday, John Madigan, to discuss harassment in the workplace. (Id. at PP 61, 72, 74; Pl. R. 56.1 Statement at PP 29, 48; Ruhling Dep. Ex. 32). Finally, plaintiff asserts that she was retaliated against following the filing of her September 23, 2003 complaint to the NYSDHR and after commencing this lawsuit on June 14, 2004. (Suppl. Compl. at PP 58-59, 72, [*64] 76).

[HN34] Claims of retaliation are analyzed using the McDonnell Douglas burden-shifting framework discussed above. See, e.g., *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).* Under that framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation by showing: (1) that the plaintiff engaged in a protected activity; (2) that the employer was aware of this activity; (3) that the employer took an adverse action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. *Treglia, 313 F.3d at 719.* A plain-

tiff's burden at this prima facie stage is de minimis. Id. Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. Id. If the defendant meets this burden, "'the plaintiff must point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible [*65] retaliation.'" Id., quoting *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001). With these standards in mind, the court considers the plaintiff's retaliation claims.

As noted above, the first element of the plaintiff's prima facie case requires her to establish that she engaged in protected activity. [HN35] An individual engages in "protected activity" under the ADA if he "has opposed any practice made unlawful by this section" or has "participated in any manner in an investigation, proceeding, or litigation under this chapter." *29 U.S.C. § 623(d).* Interpreting this language, the Second Circuit has explained that, "[a]s this choice of language clearly indicates, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989); Brands-Kousaros v. Banco Di Napoli S.P.A., No. 97 Civ. 1673(DLC), 1997 U.S. Dist. LEXIS 20345, 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997), citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992) ("While a protected activity generally takes [*66] the form of filing a formal complaint of discrimination with an administrative agency, or filing a lawsuit, it can also be found where a plaintiff makes an internal complaint of discrimination."). "[A] retaliation claim may in some instances be established even where there has been no Title VII-prohibited discrimination, *i.e.,* where the plaintiff shows, inter alia, that she had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the employer could reasonably have understood that Title VII-prohibited discrimination was the subject of her protest." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 287 (2d Cir. 1998); see also *Treglia,* 313 F.3d at 719 (applying the same standard under the ADA, explaining that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law'."), quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) [*67] (internal quotation marks omitted)).

Applying these principles here, while the defendants concede that the complaint to the NYSDHR and the instant complaint are statutorily protected activities, they contend that her declination of the buyout and her internal complaints made on December 31, 2002 about Millrod and on January 27, 2003 to Madigan were not. (Defs. Mem. at 16, n. 2).

As an initial matter, the court agrees that plaintiff's retaliation claim as based on her declination of the buyout is without merit. [HN36] The declination of a buyout is not protected activity under the law and cannot serve as the basis of a retaliation claim. [8] See, e.g., *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (explaining that only an adverse action based on opposition to statutorily prohibited discrimination is actionable). Similarly, this court is hard pressed to conclude that plaintiff's internal complaint of "favoritism" was protected activity. Plaintiff's own account of this event indicates that she did not frame this complaint as one involving discriminatory conduct. Indeed, she concedes that prior to February, 2003 she had never complained to Newsday's management [*68] about unlawful discrimination. (Ruhling Dep. at 319-21). Rather as discussed above, her complaint about Millrod was simply that he favored persons, male or female, who were loyal to him. See *supra* at 19-20. Although Newsday undertook an investigation of this complaint, finding that it was unfounded, there is nothing in the record to support plaintiff's current assertion that this was protected activity. Thus, to the extent that the plaintiff's retaliation claim is based on this internal complaint it is without merit.

8   The court notes that the complaint also alleges that the defendants offered plaintiff an opportunity to participate in the 2002 buyout again in June 2003 which she declined. (Suppl. Compl. at P 52). This claim is similarly dismissed.

The court reaches a different conclusion, however, with regard to the plaintiff's internal complaint to Madigan. The record reveals that the plaintiff wrote to Madigan on January 27, 2003 and later spoke with Lawler in early February, 2003. Her memo to Madigan [*69] references the fact that she had information she felt compelled to disclose pursuant to the anti-harassment training she had just received. (Ruhling Dep. Ex. 32). The unmistakable import of this memo was that plaintiff intended to complain about harassment in the workplace. This was clearly protected activity.

Having found that the plaintiff engaged in statutorily protected activity when she filed her 2003 internal complaint and her complaint to the NYSDHR on September 25, 2003 as well as when she filed the instant suit in June 14, 2004, the court next addresses whether Newsday was aware of these complaints. There is simply no dispute that plaintiff's complaints were known to management. In this regard, plaintiff does not have to show that the individual supervisors who subjected her to the alleged

adverse employment actions knew of her complaints. *Cunningham v. Consolidated Edison, Inc., 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at * 16 (E.D.N.Y. March 28, 2006).* Rather, it is enough to show that Newsday had a "general corporate knowledge." Id., citing *Gordon v. New York City Board of Education, 232 F.3d 111, 116 (2d Cir. 2000).* [9] Newsday can be said to have had "general [*70] corporate knowledge" of the plaintiff's complaints and she has therefore met her burden on this prong.

> 9    The court notes, however, that a "[l]ack of knowledge on the part of particular individual agents is admissible as some evidence of lack of causal connection, countering [a] plaintiff's circumstantial evidence of proximity or disparate treatment." *Gordon, 232 F.3d at 117.*

The court next considers whether the defendants took adverse action against the plaintiff. In this regard, the plaintiff asserts generally that, since her 1984 complaint of sexual harassment she has been "continuously and systematically retaliated against in various ways by the defendants." [10] The first action specifically alleged by the plaintiff to be retaliatory was her transfer from the Night News Desk to the Features Desk in March 2002. Plaintiff also cites her work schedule change in December 2002, the written reprimand she received on January 20, 2003, the suspensions she received on February 5, 2003 and April 29, 2003, as [*71] well as the transfer from the Features Desk to the Fold Desk in April 2005. The question of what conduct satisfies the adverse action requirement for a retaliation claim involves a different analysis from that applied to a substantive discrimination claim. In *Burlington Northern & Santa Fe Railway Co., v. White,     U.S.    , 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006),* the Supreme Court held that[HN37] a plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment. Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id. at 2412-13.* In *Kessler v. Westchester County Dept of Social Services, 461 F. 3d 199 (2d Cir. 2006)* the Second Circuit, applying *White,* determined that a job reassignment may satisfy the adverse action requirement in a retaliation claim. *Kessler, 461 F.3d at 209.* Folded into the analysis of what constitutes an actionable adverse action is the requirement that there be a causal connection between the adverse action and the protected activity.

> 10    The defendants fail to address whether this 1984 complaint constitutes protected activity which for purposes of this discussion, the court assumes it is.

[*72] [HN38] In evaluating whether a causal connection exists between the adverse action and the protected activity, courts have considered their temporal proximity. See, e.g., *Cunningham, 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at * 19,* citing *Cifra, 252 F.3d at 216,* quoting *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996); Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986).* The cases "uniformly hold that the temporal proximity must be 'very close.'" *Cunningham, 2006 U.S. Dist. LEXIS 22482, 2006 WL 842914, at *19,* quoting *Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509, (2001).* While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action" *Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554-555, n. 5 (2d Cir. 2001)* (collecting cases), district courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action [*73] seems to be the dividing line. *Ashok v. Barnhart, 289 F. Supp.2d 305, 315 (E.D.N.Y 2003)* ("a period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Hussein v. Hotel Employees & Restaurant Union, Local 6, 108 F. Supp.2d 360, 367 (S.D.N.Y. 2000)* ("the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich American Ins. Group, 16 F. Supp.2d 414, 436 (S.D.N.Y. 1998)* ("causal connection" element of retaliation claim"not established where two-and-a-half months lapsed between complaint and adverse action).

Applying these standards, the court finds that with respect to plaintiff's 1984 complaint, her transfer in 2002 is simply too remote to support a finding of a causal connection. The plaintiff has not provided any evidence of adverse actions taken in the eighteen years between the 1984 complaint and the 2002 transfer and as such her claim of retaliation based on this protected activity is dismissed.

The court, however, finds a compelling causal connection between the 2003 internal complaint [*74] and the plaintiff's suspensions which requires denial of defendants' motion for summary judgment in this respect. In short, a reasonable juror could find that plaintiff's suspension the day after her first conversation with Lawler and her suspension within three weeks of her second conversation with Lawler were intended to retaliate against plaintiff and dissuade her from pursuing her complaint.

Finally, although the plaintiff was clearly engaged in protected activity when she filed a complaint with the

NYSDHR in September 2003 and this lawsuit in June 2004, the only adverse action alleged following these complaints was plaintiff's transfer from the Features Desk to the Fold Desk in April 2005. Given the significant passage of time between either of these complaints and the April 2005 transfer, the temporal relationship is simply too attenuated to support a causal connection. Thus, in the absence of any other evidence, the court finds that no reasonable juror could find a causal connection between these events and as such her retaliation claim as it relates to the filing of this lawsuit and her complaint with the NYSDHR is dismissed. [11]

> 11    The defendants' articulated non-retaliatory reasons for its actions as well as the plaintiff's argument concerning pretext are discussed above (see supra at 17-19, 26-27) and do not alter this outcome.

[*75]  H. State Law Claims

i) Negligent Infliction of Emotional Harm

The plaintiff alleges a claim for negligent infliction of emotional harm. Defendants argue that this claim is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"), *N.Y. Work. Comp. L. §§ 11 and 29(6)*, and cites several cases in support. (Defs.' Mem. at 32, citing *Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997)*(affirming dismissal of negligence claim as barred by the WCL); *Gerson v. Giorgio Sant'Angelo Collectibles, 176 Misc.2d 388, 392, 671 N.Y.S.2d 958, 961 (Sup. Ct. N.Y. Co. 1998)* holding that plaintiff's negligent infliction of emotional distress claim arising from alleged sex discrimination was barred by the WCL). Plaintiff does not challenge the defendants' statement of the law; rather, the plaintiff simply contends that the court has jurisdiction over her state law negligence claim. (Pl.'s Mem. at 33-34).

There is no question that the court has jurisdiction to determine the plaintiff's negligence claim pursuant to *28 U.S.C. § 1367* which permits supplemental jurisdiction over state law claims.  [*76]  On the other hand, [HN39] the New York Workers' Compensation Law exclusive remedy doctrine bars an employee from bringing a negligence or gross negligence based claim against an employer . . . ." *Lauria v. Donahue, 438 F. Supp.2d 131, 141 (E.D.N.Y. 2006)*; *Meletiche v. Holiday Inn Worldwide, No. 95 Civ. 6666 (BSJ), 1996 U.S. Dist. LEXIS 6232, 1996 WL 239893 (S.D.N.Y. May 8, 1996)*; *Chrzanowski v. Lichtman, 884 F. Supp. 751, 756 (W.D.N.Y. 1995)*, citing *O'Brien v. King World Productions, Inc., 669 F. Supp 639, 641 (S.D.N.Y. 1987)*.

Courts in the Second Circuit applying this rule have routinely dismissed negligence claims brought by plaintiffs in the context of complaints alleging employment discrimination. See, e.g., *Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 138 (2d Cir. 2001)* (In Title VII action affirming summary judgment dismissing negligent retention and supervision claims because they were precluded by the exclusive remedy provisions of the *WCL*); *Torres, 116 F.3d at 640* (In race discrimination claim dismissing employee's common law negligence claim as barred by the WCL's exclusivity provision); *Duran v. Jamaica Hospital, 216 F. Supp.2d 63, 66 (E.D.N.Y. 2002)* [*77] (dismissing negligence claim as barred by WCL in context of Title VII complaint discrimination); *Persaud v. S. Axelrod Co., No. 95 Civ. 7849 (RPP), 1996 U.S. Dist. LEXIS 160, 1996 WL 11197 (S.D.N.Y. Jan. 10, 1996)* (dismissing negligence claims as barred by WCL in context of plaintiff's Title VII and NYSHRL complaint of employment discrimination); *Gerson, 176 Misc.2d at 392, 671 N.Y.S.2d at 961* (dismissing former employee's claims of negligent infliction of emotional distress as barred by the WCL in context of complaint alleging sex discrimination under state and local human rights laws). Thus, the negligence claim here is barred by the WCL and is dismissed.

**ii) Intentional Infliction of Emotional Harm**

Finally, the plaintiff alleges a common law claim of intentional infliction of emotional harm ("IIED"). Defendants assert that the IIED claim should be dismissed because the plaintiff's allegations fall far short of the type of "extreme and outrageous" conduct required to establish an IIED claim.

[HN40] Under New York law, the elements of a claim for IIED are: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the [*78] conduct and injury; and (4) severe emotional distress." *Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)*. While IIED does not proscribe specific conduct, the New York Court of Appeals has required that a plaintiff allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (N.Y. 1993)*. "New York sets a high threshold for conduct that is considered 'extreme and outrageous' enough to constitute intentional infliction of emotional distress," *Smalls v. Allstate Insurance Co., 396 F. Supp.2d 364, 375 (S.D.N.Y. 2005)*, and "[i]ntentional infliction of emotional distress is an extremely disfavored cause of action." *Durant v. A.C.S. State and Local Solutions, Inc., No. 05-7303 (CM), 460 F. Supp. 2d 492, 2006 U.S. Dist. LEXIS 80987, 2006 WL 3199150, at *6 (S.D.N.Y. Nov. 1, 2006)*, citing *Marley v. Ibelli, 203 F. Supp.2d 302, 311 (S.D.N.Y. 2001)*. Clearly, the allegations in the instant

2007 U.S. Dist. LEXIS 116, *

complaint fail to meet this [*79] high threshold and as such her claim is subject to dismissal on this basis alone. Additionally, however, the absence of adequate proof of severe emotional distress warrants dismissal of this claim. A plaintiff's claim of severe emotional distress must be supported by "medical evidence, not just the mere recitation of speculative claims." *Calhoun v. Mastec, Inc., No. 03 Civ. 368S, 2006 U.S. Dist. LEXIS 70374, 2006 WL 2806452 (W.D.N.Y. Sept. 28, 2006)* (granting summary judgment dismissing plaintiff's IIED claim where record contained no medical evidence to support claim that he suffered mental distress as a result of being fired) (citation omitted). Here, plaintiff does not provide any evidence establishing that she suffered any mental distress much less *severe* mental distress. In the absence of such evidence, the plaintiff's IIED claim must fail. Accordingly, the defendants' motion for summary judg-

ment as to this claim is granted and the plaintiff's IIED claim is dismissed.

**CONCLUSION**

For the reasons stated above, the defendants' motion for summary judgment is granted in part and denied in part.

Dated: Central Islip, New York

January 3, 2007

**SO ORDERED:**

ARLENE R. LINDSAY

[*80] United States Magistrate Judge

STEPHEN P. SONNENBERG
GENEVIEVE C. NADEAU
PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, New York 10022
(212) 318-6000

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OSWALD WILSON,

                Plaintiff,

        - against -

AMERICAN BROADCASTING CO., INC., ABC
CO, INC., DISNEY ENTERPRISES, INC., THE
WALT DISNEY COMPANY, MICHAEL
ZDYRKO, CHARLES ZANLUNGHI, WILLIAM
TRACY, BRENDAN BURKE, ROBERT SCHLES
AND SANDY RAMJATTAN

                Defendants.

**1:08-cv-01333-LAP**

**CERTIFICATE OF SERVICE**

---

    The undersigned hereby certifies that on July 17, 2008, she caused to be electronically filed the foregoing **Reply Memorandum of Law in Support of Motion to Dismiss Portions of Plaintiff's Complaint** with the Clerk of the District Court using the CM/ECF system, which sent notification of such to **Lennox S. Hinds, Esq., Attorney for Plaintiff**.

Dated: New York, New York
       July 17, 2008

                                             Erin E. LaRuffa